Jerrold M. SONET, Plaintiff,

v.

TIMBER COMPANY, L.P., Plum Creek Management Company, L.P., and P.C. Advisory Corporation I, Defendants.

No. 16639.

Court of Chancery of Delaware, New Castle County.

Submitted: Nov. 17, 1998.
Decided: Dec. 16, 1998.

---

real estate investment trust ("REIT"). The issue presented is this: Where a limited partnership agreement unambiguously provides that the general partner has sole discretion over setting and approving the terms of a transaction, and where unitholders of the limited partnership have the power to veto the transaction as a function of a supermajority vote requirement, are there any other fiduciary duty principles that must apply to the proposed transaction as a matter of law? Stated differently, what controls the governance process in the context of limited partnerships—the partnership agreement or common law fiduciary duty doctrines? For the reasons stated below, I dismiss Plaintiff's amended complaint, concluding as a matter of law that the unambiguous terms of the partnership agreement have the effect of limiting the Court's review of the transaction presently in dispute.[1]

Joseph A. Rosenthal, and Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; of Counsel: Sidney B. Silverman, of Silverman, Harnes, Harnes, Prussin & Keller, New York City, for Plaintiff.

Edward P. Welch, Andrew J. Turezyn, and Stephen D. Dargitz, of Skadden, Arps, Slate, Meagher & Flom, L.L.P., Wilmington, Delaware, for Defendant Timber Co., L.P.

Jesse A. Finkelstein, and Srinivas M. Raju, of Richards, Layton & Finger, P.A., Wilmington, Delaware; of Counsel: Robert A. Sacks, of Sullivan & Cromwell, Los Angeles, California, for Defendants Plum Creek Management Company, L.P., and P.C. Advisory Corporation I.

## MEMORANDUM OPINION

CHANDLER, Chancellor.

This dispute arises out of a transaction in which a limited partnership organized under Delaware law seeks to convert itself into a

## I. BACKGROUND

Jerrold M. Sonet ("Plaintiff") is a holder of depository units ("Units") representing limited partnership interests in Plum Creek Timber Company, L.P., a Delaware limited partnership (the "Partnership"). The Partnership is registered with the Securities and Exchange Commission and the Units are publicly traded on the New York Stock Exchange. The Partnership and its corporate subsidiaries own, manage and operate approximately 2.4 million acres of timberland and twelve wood products conversion facilities in the Northwest and Southeast United States.

Defendant Plum Creek Management Company, L.P., a Delaware limited partnership, is the general partner of the Partnership ("Management" or the "General Partner"). Defendant PC Advisory Corp. I, a Delaware corporation ("PC Advisory") (with the Partnership and Management, hereinafter referred to as "Defendants"), is the ultimate general partner of Management and, thus,

---

1. As a preliminary manner, I pause to thank the attorneys who argued this case before me for their clear presentation of the issues. Mr. Silverman of Silverman, Harnes, Harnes, Prussin & Keller, Mr. Finkelstein, of Richards, Layton & Finger, and Mr. Welch, of Skadden, Arps, Slate, Meagher & Flom LLP also provided the Court with concise and instructive post-argument memoranda that I relied on heavily in my analysis of the limited partnership agreement.

might be considered the indirect general partner of the Partnership.

Management has a 2% general partner interest in the income and cash distributions of the Partnership, subject to certain adjustments. Specifically, pursuant to the limited partnership agreement (the "Partnership Agreement" or the "Agreement"), Management is required to make quarterly cash distributions of all "Available Cash," 98% of which goes to unitholders and 2% of which goes to Management. When the distribution of cash exceeds certain quarterly target levels, Management is entitled to receive an additional "incentive distribution" equal to a percentage of such excess, on a sliding scale which increases up to a maximum of 35% of distributions above the highest target level.

In June of 1998 the Partnership announced a plan to convert itself into a REIT by way of a merger with an entity specifically created for the purpose of conversion. Under the terms of that conversion Units would be converted into shares in the new REIT on a one-to-one basis. In addition, under the terms of the proposed conversion, in lieu of its 2% interest and its incentive distribution rights, Management would receive REIT shares equal to 27% of the total shares outstanding. The essence of Plaintiff's case is that the proposed allocation to Management of the new REIT is unfair and is the result of, among other things: 1) a self-dealing transaction between the General Partner and the Partnership; 2) improper manipulations of past distributions; 3) an attempt by PC Advisory to limit its exposure to upcoming losses; 4) unlawful entrenchment of PC Advisory and its principals, who will effectively control the new entity; and 5) manipulative timing of the transaction, which will shield unitholders from knowing of imminent losses caused by

fundamental economic downturns. In addition to the foregoing, Plaintiff claims that the Defendants understood that they had a duty to treat the unitholders fairly, and by taking voluntary precautions to meet that duty, Defendants were bound by operation of law to assume the fulfillment of traditional fiduciary duties.

## II. ARGUMENTS

In essence, Plaintiff's claims can be characterized broadly as duty of loyalty claims.[2] Plaintiff takes the position that, under the Agreement, nothing modifies the default fiduciary duties that underlie the Delaware Revised Uniform Limited Partnership Act.[3] Thus, Plaintiff claims, it is entirely proper for this Court to review Management's and PC Advisory's self-interested actions vis-à-vis the unitholders and the potential harms that the unitholders might suffer under the proposed conversion, in light of established fiduciary principles.

Defendants claim that, under Delaware limited partnership law, this Court should not reach that far. Stated simply, Defendants argue that Delaware limited partnership law recognizes that by virtue of a clearly written partnership agreement limited partnerships are explicitly authorized by statute to modify the default rules which might otherwise govern the relationship between general partners and limited partners, and between limited partners themselves. Thus, in this case Defendants argue that I should look to the Partnership Agreement to resolve this dispute. Since the Partnership Agreement defines the role of the general partner and the limited partners in the governance of the partnership, according to the Defendants, no

---

**2.** In his brief, Plaintiff argues that the Court should view this transaction as a "controlled" transaction or, in other words, a situation where a control group dictates the terms of the transaction to the detriment of other equity holders. Thus, Plaintiff's claim amounts to an allegation of self-dealing. Plaintiff goes on to argue that because the General Partner is allowed to dictate the terms of the transactions (a fact conceded by the Defendants) this Court should assert its equity powers to protect the unitholders just as it would protect minority shareholders in an improper self-dealing transaction. It is true that in

certain situations, for instance a parent-subsidiary merger where minority shareholders are frozen out, Delaware courts have held that the parent company owes fiduciary duties to minority shareholders. *See Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971). As I explain later, however, I refuse in these circumstances to import protections developed in the corporate context into our limited partnership jurisprudence.

**3.** 6 *Del. C.* § 17-101, *et seq.*

need exists to go outside of that document to assess the propriety of the Defendants' actions in this case.

## III. ANALYSIS

 Delaware's limited partnership jurisprudence begins with the basic premise that, *unless limited by the partnership agreement,* the general partner has the fiduciary duty to manage the partnership in its interest and in the interests of the limited partners.[4] That qualified statement necessarily marries common law fiduciary duties to contract theory when it comes to considering actions undertaken in the limited partnership context. Thus, I think it a correct statement of law that principles of contract preempt fiduciary principles where the parties to a limited partnership have made their intentions to do so plain.

For instance, in *Kahn v. Icahn,*[5] this Court held that where a limited partnership agreement explicitly provided that the general partner and its affiliates were authorized to compete with the partnership, the limited partners could not then properly maintain a usurpation of partnership opportunity claim when the general partner and its affiliate began to actually compete with the partnership as anticipated by the agreement. That holding was premised on the legal determination that "as a matter of statutory law, the traditional fiduciary duties among and between partners are defaults that may be modified by partnership agreements. This flexibility is precisely the reason why many choose the limited partnership form in Delaware."[6] Delaware cases routinely uphold this view of limited partnership law.[7] Those commentators who have addressed the subject at the deepest levels agree that the partnership form is particularly useful due to its contract theory-based structure.[8]

### A. Limited Partnerships Generally

Limited partnerships have become the limited liability entity of choice for certain closely-held business ventures and are especially prevalent in enterprises where a general partner (or a corporate subsidiary) is actively engaged in investing the limited partners' passive investments. While originally used as a way of achieving preferential tax treat-

---

**4.** See Boxer v. Husky Oil Co., Del. Ch., 429 A.2d 995, 997 (1981).

**5.** Del. Ch., C.A. No. 15916, at 5–7, Chandler, C., 1998 WL 832629 (Nov. 12, 1998).

**6.** *Id.* at 6. Section 17–1101(d) of the Delaware Revised Limited Partnership Act sets out the relevant policy consideration:

To the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited partnership or to another partner ... (2) the partner's or other person's duties and liabilities may be expanded or restricted by the provisions in a partnership agreement.

**7.** See, e.g., In re Cencom Cable Income Partners, L.P. Litig., Del. Ch., C.A. No. 14634, at 10, Steele, V.C., 1996 WL 74726 (Feb. 15, 1996) (limited partnership agreements may authorize actions and modify fiduciary duties creating "safe harbors"). See also Wilmington Leasing, Inc. v. Parrish Leasing Company, L.P., Del. Ch., C.A. No. 15202, at 30, Jacobs, V.C., 1996 WL 752364 (Dec. 23, 1996) ("Where, as here, a [p]artnership [a]greement specifically addresses the rights and duties of the partners, any fiduciary duty that might be owed by the ... [p]artners is satisfied by compliance with the applicable provisions of the partnership agreement."); In re Marriott Ho-

tel Properties II L.P. Unitholders Litig., Del. Ch., C.A. No. 14961, at 11, 14–15, Allen, C., 1996 WL 342040 (June 12, 1996); US West, Inc. v. Time Warner, Inc., Del. Ch., C.A. No. 14555, Allen, C., 1996 WL 307445 (June 6, 1996); Litman v. Prudential–Bache Properties, Inc., Del. Ch., C.A. No. 12137, at 10, Chandler, V.C., 1993 WL 5922 (Jan. 4, 1993) (where partnership agreement expressly acknowledged potential conflicts of interest the court barred derivative claims), remanded on other grounds, Del.Supr., C.A. No. 61, Moore, J., 1993 WL 603303 (Nov. 18, 1993), aff'd, Del. Supr., 642 A.2d 837 (1994).

**8.** See generally Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law 1–39 (1991); Henry N. Butler & Larry E. Ribstein, Opting Out of Fiduciary Duties: A Response to the Anti–Contractarians, 65 Wash. L.Rev. 1 (1990); Frank H. Easterbrook & Daniel R. Fischel, Contract and Fiduciary Duty, 36 J.L. & Econ. 425 (1993); Richard A. Epstein, Contract and Trust in Corporate Law: The Case of Corporate Opportunity, 21 Del. J. Corp. L. 1 (1996). For a contrary view, see Deborah A. DeMott, Beyond Metaphor: An Analysis of Fiduciary Obligation, 1988 Duke L.J. 879; Melvin Aron Eisenberg, The Limits of Cognition and the Limits of Contract, 47 Stan. L.Rev. 211 (1995); Lawrence E. Mitchell, The Death of Fiduciary Duty in Close Corporations, 138 U. Pa. L.Rev. 1675 (1990).

ment, because of recent modifications to federal tax law, it is unclear that the limited partnership form provides significant tax benefits compared to other limited liability and so-called pass-through entities.[9] Clearly some other relevant characteristic of the limited partnership must contribute to its increasing popularity. One might reasonably conclude that the statutory authority granted to limited partnerships to contract around—or to enhance—fiduciary duties goes a long way in explaining this popularity.

Although particularly well suited for closely-held businesses, limited partnerships have grown in popularity over the last forty years as publicly-traded entities (known as master limited partnerships) and are often designed to roll-up, or consolidate, a number of smaller limited partnerships.[10] If embodied in a security (e.g., the Units in this case) which represents a transferable interest in the entity, limited partnership interests can become more liquid as a result of exchange listing, security registration, and more widely-known public information about a limited partnership. Such investment vehicles can greatly facilitate the accretion of capital for further expansion of a partnership's objectives.

One might reasonably doubt whether the limited partnership structure is the most efficient means of attracting capital for business ventures (especially in the context of widely held equity participation). One reason for this doubt is that there is uncertainty about the legal protections afforded to limited partners in any particular limited partnership. Considering § 17–1101(d) of the Delaware Revised Uniform Limited Partnership Act's apparently broad license to enhance, reform, or even eliminate fiduciary duty protections, it is unclear how the market goes about pricing the value of protections afforded to limited partners in any particular flavor of limited partnership.[11]

The desirability, from an efficient-pricing perspective, of the potentially infinite variations on modified fiduciary duties in the context of widely-held limited partnerships is not a matter for adjudication in cases involving the limited partnership form. It is evident, however, that the Delaware Legislature has seen fit to enact the Delaware Revised Uniform Limited Partnership Act and promoters and organizers have increasingly adopted that organizational form for their ventures. Once authorized by law, the decision to adopt and operate under a particular limited liability structure is the sort of fundamental business decision that courts routinely protect. As a general matter, courts should be, and are, reluctant to import jurisprudence from one area of the law—which is loaded with notions of efficiency and fairness that are well developed for that particular context—into a separate area of the law—where many procedural and substantive aspects present in other legal regimes are only optional defaults. Mindful of that caution, I decline to rely unnecessarily on this Court's traditional analyses involving fiduciary duties in the corporate context. When a particular limited partnership has plainly opted out of the statutory default scheme, judicial review, in my opinion, must look to the limited partnership's distinct doctrinal foundation in contract theory. There is no reason, at least in the case before me, to depart from that

---

9. *See generally* George K. Yin, *The Taxation of Private Business Enterprises: Some Policy Questions Stimulated by the "Check–the–Box" Regulations*, 51 SMU L.Rev. 125 (1997) (Professor Yin of the University of Virginia and Professor David Shakow of the University of Pennsylvania are credited for their expert stewardship as co-reporters to the American Law Institute's Federal Income Tax Project on the Taxation of Pass–Through Entities). Although not relevant to my decision in this matter, it is interesting to note that 3984, 4038 and 5800 Delaware limited partnerships were formed in each of the last three years, respectively. And, according to Laura Y. Marvel, Corporations Administrator for the Division of Corporations, the Division estimates that almost 6000 domestic limited partnerships were formed for fiscal year 1998. Obviously, the market for this alternative entity remains vibrant.

10. *See* Donna D. Adler, *Master Limited Partnerships*, 40 U. Fla. L.Rev. 755, 756–57 (1988).

11. Such market pricing difficulties are less relevant in the context of Delaware corporations that, as an empirical matter, often have very similar corporate charters and where the legal protections routinely afforded to corporations' shareholders flow from an established and predictable jurisprudence.

source to further some highly generalized interest of equity.

■ In short, I think that under Delaware limited partnership law a claim of breach of fiduciary duty must first be analyzed in terms of the operative governing instrument—the partnership agreement—and only where that document is silent or ambiguous, or where principles of equity are implicated, will a Court begin to look for guidance from the statutory default rules, traditional notions of fiduciary duties, or other extrinsic evidence. In this case, my task is easy as I find that the partnership agreement in issue is clear on the threshold question of how the transaction in dispute should be governed.

### B. The Partnership Agreement

■ The Agreement provides the General Partner with the discretion and power to manage virtually all of the affairs of the Partnership. To counterbalance the significant powers of the General Partner, the Agreement establishes an integrated framework of checks on that power. With respect to many of the day-to-day affairs of the Partnership, which are not subject to unitholder ratification, the General Partner's discretion is counterbalanced by the requirement that all of the General Partner's actions be fair and reasonable to the Partnership.[12] With respect to certain extraordinary acts or transactions, such as mergers, the General Partner is given much broader latitude, namely "sole discretion." In the case of a

merger in particular, however, the General Partner's sole discretion is checked by the Agreement's requirement that a *supermajority of unitholders (66 2/3 %) must approve the transaction.*

Plaintiff argues that under § 6.1 of the Agreement [13] any merger proposed by the General Partner (*e.g.*, the merger used to effectuate the conversion to a REIT) must be fair and reasonable to the Partnership. I understand Plaintiff to contend that since there is no language in § 6.1 that limits or expands the General Partner's discretion in the event of a merger, the fiduciary default rule that the terms of any transaction must be fair, reasonable, and aimed at furthering the interests of the partnership (and the limited partners) must apply. The problem with Plaintiff's argument is that it ignores the remainder of the Agreement. It also fails to recognize the rather practical problem of the impossibility of writing contract provisions that incorporate every bell and whistle all at once. As the following analysis shows, this Agreement is sufficient in communicating the intended governance structure. To understand that structure one needs to read the Agreement as a whole, and not just concentrate on one provision that mentions one of the "magic words." [14]

The Agreement contemplates two fundamentally different types of managerial actions that may be taken: those that do not require unitholder approval and those that do. The requirement that the General Part-

---

**12.** In some sense the provisions that provide for this aspect of the relationship are an explicit acceptance of the default duty of loyalty and fair dealing rules.

**13.** Section 6.1 provides in relevant part:

In addition to the powers now or hereafter granted a general partner of a limited partnership under applicable law or which are granted to the General Partners under any other provision of this Agreement, the General Partner ... shall have full power and authority to do all things deemed necessary and desirable by it to conduct the business of the Partnership ... including, without limitation, ... (iii) the acquisition, disposition, mortgage, pledge, encumbrance, hypothecation or exchange of any assets of the Partnership or the merger or other combination of the Partnership with or into another entity (all of the foregoing subject

to any prior approval which may be required by [66 2/3% of the outstanding Units, as provided by other sections in the agreement]). Obviously, § 6.1 is simply a broad enabling provision that confers upon the General Partner the power and authority to manage the affairs of the Partnership.

**14.** Because I find that the Partnership Agreement is clear and unambiguous on its face, I do not reach Plaintiff's argument that other extrinsic evidence (*e.g.*, the Partnership's 1989 Offering Prospectus or the Unanimous Consent Resolution of March 4, 1998) might justify the imposition of common law fiduciary duties. *See SBC Interactive, Inc. v. Corporate Media Partners*, Del. Supr., 714 A.2d 758, 761 (Aug. 10, 1998) ("We also agree with the Court of Chancery's ruling that the [partnership] Agreement is unambiguous, and its refusal to consider evidence extrinsic to the partnership agreement is correct.").

ner's action be "fair and reasonable" has no application where unitholder approval is required, such as with the proposed merger. Under the terms of § 6.9(a) of the Agreement, where unitholder approval is *not* required, *e.g.*, day-to-day management decisions of the Partnership, a requirement that the transaction be "fair and reasonable" is used as a surrogate check, in lieu of unitholder approval, on the General Partner's power.[15] In these situations, when a transaction is objectively "fair and reasonable," it is "deemed approved" by the unitholders. In any event, pursuant to § 6(b) of the agreement, in situations where the General Partner is authorized to act according to its own discretion, there is no *requirement* that the General Partner consider the interests of the limited partners in resolution of a conflict of interest.

Section 6.9(a), when it refers to a "fair and reasonable resolution," refers to situations where the General Partner makes unilateral decisions and where the unitholders will not explicitly approve the terms of the decision. Section 6.9 does not apply to the present case because it applies when the General Partner engages in unilateral action. In the case of the merger (and concomitant conversion) contemplated in this case, the General Partner's actions are not unilateral because of the required unitholder vote. It makes no sense, therefore, for the decision to merge to be "deemed" approved because, pursuant to Article XVI of the agreement, it must *actually* be approved by 66 2/3% of the outstanding units.[16] Thus, § 6.9(a) is inapplicable to the

---

15. Section 6.9 of the Agreement illuminates this dynamic, specifically providing:

6.9 (with emphasis added): Resolution of Conflicts of Interest. (a) Unless otherwise expressly provided in this Agreement, whenever a potential conflict of interest exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Partner, on the other hand, any resolution or course of action in respect of such conflict of interests shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, of any agreement contemplated herein, or any duty stated or implied by law or equity, *if the resolution or course of action is, or, by operation of this Agreement, is deemed to be fair and reasonable to the Partnership. Any such resolution or course of action in respect of any conflict of interest shall not constitute a breach of this Agreement, or of any other agreement contemplated herein, or of any duty stated or implied by law or equity, if such resolution or course of action is fair and reasonable to the Partnership.* The General Partner shall be authorized in connection with its resolution of any conflict of interest to consider (i) the relative interest of any party to such conflict, agreement, transaction, or situation and the benefits and burdens relating to such interests; (ii) any customary or accepted industry practices; (iii) any applicable generally accepted accounting practices or principles; and (iv) such additional factors as the General Partner determines in its *sole discretion* to be relevant, reasonable or appropriate under the circumstances. Nothing contained in this Agreement, however, is intended to nor shall it be construed to require the General Partner to consider the interests of any Person other than the Partnership. In the absence of bad faith by the General Partner, the resolution, action or terms so made, taken or provided by the General Partner with re-

spect to such matter shall not constitute a breach of this Agreement or any other agreement contemplated herein or a breach of any standard of care or duty imposed herein or therein under the Delaware Act or any other law, rule or regulation.

(b) Whenever this Agreement or any other agreement contemplated hereby provides that the General Partner or any of its Affiliates is permitted or required to make a decision (i) in its "discretion" or under a grant of similar authority or latitude, the General Partner or such Affiliate shall be entitled to consider only such interests and factors as it desires and shall have no duty or obligation to give any consideration to any interest of, or factors affecting, the Partnership or any Limited Partner, or (ii) in "good faith" or under another express standard, the General Partner or such Affiliate shall act under such express standard and shall not be subject to any other or different standards imposed by this Agreement or any other agreement contemplated hereby.

(c) Whenever a particular transaction, arrangement or resolution of a conflict of interest is required under this Agreement to be "fair and reasonable" to any Person, the fair and reasonable nature of such transaction, arrangement or resolution shall be considered in the context of all similar or related transactions.

16. Unitholders have the unfettered discretion to veto such a transaction by declining to grant it supermajority approval, even if the proposed merger were more than fair and reasonable by any objective measure. In other words, the unitholders have the right to reject a proposed merger for any reason whatsoever, whether rational or irrational, or conversely, to approve it on a basis other than an objective fairness test. In addition, at oral argument counsel for the Defen-

present case. In addition, § 6 .9(a) applies only "[u]nless otherwise expressly provided in [the] [A]greement." As further analysis shows, §§ 16.2 and 16.3 are clearly the operative sections that govern the disputed merger.

The procedures pursuant to which a merger may be effectuated are set forth under Article XVI of the Agreement, which is titled "Merger." Sections 16.2 and 16.3 provide the blueprint for proceeding with a merger transaction.[17] First, the General Partner is permitted to enter into a merger in its sole discretion (*i.e.*, on the terms that the General Partner sees fit without required reference to the limited partners' interests). Second, the merger agreement is presented for a vote. Third, the merger agreement is approved upon receiving the endorsement of at least 66 2/3% of the outstanding Units. This careful framework established by the Agreement confirms that to the extent that unitholders are unhappy with the proposed terms of the merger (and in this case the resultant conversion) their remedy is the ballot box, not the courthouse.

## C. Assumption of Fiduciary Duties

■ Plaintiff puts forth the alternative argument that, even if the General Partner did not originally owe common law fiduciary duties as a matter of law or by virtue of the Agreement, when the General Partner appointed a special committee to oversee the transaction, it undertook to conduct the process in a fair, diligent and independent manner. Plaintiff contends that the Defendants structured the transaction to create an atmosphere of fair dealing that, allegedly, would help them obtain the support of the unitholders. Thus, Plaintiff concludes that Defendants voluntarily assumed fiduciary duties that they may not have otherwise owed.

In support of this reasoning, Plaintiff relies heavily on *Cencom Cable Income Partners, L.P., Litigation.*[18] In *Cencom*, Vice Chancellor Steele refused to dismiss claims that the general partner had breached a "voluntarily assumed" fiduciary duty that was not originally imposed by the partnership agreement. The Vice Chancellor found that the general partner voluntarily undertook the responsibility of retaining a law firm to act as "independent" counsel for the limited partners to assure the integrity of the transaction and to attest to the fact that terms of the partnership agreement were followed. Vice Chancellor Steele determined that there were issues of fact to be resolved as to whether the "independent" counsel actually performed "as advertised." Central to the holding in *Cencom* is the fact that the general partner circulated a disclosure statement that described what the independent counsel was

---

dants represented to the Court that the General Partner and PC Advisory control no more than 4% of the limited partnership Units. Thus, there is no threat that the General Partner could "control" the outcome of a vote.

**17.** Sections 16.2 and 16.3 provide, in relevant part (with emphasis added):

16.2 Procedure for Merger or Consolidation. Merger or consolidation of the Partnership pursuant to this Article requires prior approval of the General Partner. If the General Partner shall determine, *in the exercise of its sole discretion*, to consent to the merger or consolidation, the General Partner shall approve the Merger Agreement, which shall set forth:
(a) The names and jurisdictions of formation or organization of each of the business entities proposing to merge or consolidate;
(b) The name and jurisdictions of formation or organization of the business entity that is to survive the proposed merger or consolidation (hereafter designated the "Surviving Business Entity");

(c) The terms and conditions of the proposed merger or consolidation . . . .
16.3 Approval by Limited Partners of Mergers or Consolidation. (a) The General Partner of the Partnership, upon its approval of the Merger Agreement, shall direct that the Merger Agreement be submitted to a vote of the Limited Partners whether by a meeting or by written consent . . . .
(b) The Merger Agreement shall be approved upon receiving the affirmative vote or consent of the holders of at least 66 2/3% of the outstanding Units of each class unless the Merger Agreement contains any provision, which if contained in an amendment to the Agreement, the provisions of this Agreement or the Delaware Act would require the vote or consent of a greater percentage of the Percentage Interests of the Limited Partners or of any class of Limited Partners, in which case such greater percentage vote or consent shall be required for the approval of the Merger Agreement.

**18.** Del. Ch., C.A. No. 14634, Steele, V.C., 1997 WL 666970 (Oct. 15, 1997).

supposed to do. Because of this affirmative disclosure, Vice Chancellor Steele held that "the General Partner voluntarily assumed a duty to ensure that [the independent counsel] would fulfill [its] obligations and that the Limited Partners could rely on the General Partner's representations that the [independent counsel] would do so." [19]

*Cencom* can be distinguished easily from the present case. Here, the proxy statement has not yet been distributed. In fact, the Defendants in this case have not yet sought unitholder action. There is no element of reliance on misleading voluntary disclosure intended to induce the unitholders' acquiescence to the proposed conversion. Nor has Plaintiff complained about the adequacy of disclosures about the transaction.

Plaintiff asks me to conclude, as a matter of law, that merely because the General Partner appointed a special committee to oversee the transaction, the General Partner thereby imported common law fiduciary duties into its relationship with the unitholders. I cannot agree with this view. Even if the General Partner's aim was to conduct a process in a manner designed to help obtain the support of the unitholders, without misleading affirmative disclosures professing the fairness and independence of the special committee, it would unreasonably distort the Agreement to hold this General Partner to common law fiduciary standards. Plaintiff's asserted theory of voluntary assumption of common law fiduciary duties is actually a *potential* disclosure claim. As such, it is not ripe and must be dismissed.

## IV. CONCLUSION

The Partnership Agreement is clear and unambiguous. It provides that the General Partner can propose a merger on *any* terms, and that if the unitholders are displeased with those terms they are free to reject it. Since Plaintiff alleges only the mere potential for misleading disclosure, or only a possibility of disclosure that omits material information (*e.g.*, a change in the Partnership's underlying economic condition), I cannot entertain the claim that the proposed conversion is unfair or that its timing is manipulative. As Plaintiff has failed to state a claim upon which relief can be granted, the amended complaint is dismissed.

IT IS SO ORDERED.

---

19. *Id.* at 16. The Opinion goes on to say: "This conclusion turns not on what the General Partner may or may not have understood its fiduciary obligations to entail (a meaningless, subjective inquiry), but on the fact that it actively undertook this role ostensibly (1) to actually confer a benefit on the Limited Partners or (2) to convince them the self-interested transaction would conform to the terms of the Partnership agreement in order to induce their approval." *Id.*