Billings, Thomas P., J.
For the reasons that follow, the defendants’ Motion to Dismiss is ALLOWED IN PART and DENIED IN PART.
FACTS
The Amended Complaint, whose allegations are taken as true for present purposes, states (in broad summary) that in the year 2000 the plaintiff (“VIP”) invested in, and became a limited partner of, the JT Venture Partners Cochin Fund L.P. (the “Fund”), a Delaware limited partnership. In so doing, VIP relied on representations made in a Limited Partnership Agreement (the “LPA”) and a Private Placement Memorandum (“PPMj, both of which are attached to the complaint.
The corporate defendant is the general partner of the Fund, and manages its affairs. The individual defendants are two of its managing members (on whose “stated skill and expertise” VIP also relied); they formulate and oversee the Fund’s investment strategies.
The Fund has made venture capital investments in a number of companies. One of these — a company called Hyperchip, in which the Fund invested in 2003 — resulted in a capital call to the partners. The-kkethala and John gave the partners an intentionally inflated valuation of Hyperchip. VIP doubted the valuation and refused the capital call. Under the terms of the LPA, this refusal resulted in a 25% reduction in its interest, and other punitive sanctions.
In fact, Hyperchip was valueless at the time the Fund invested in it, as Thekkethala and John knew, and the Fund has since written down the value of the investment to “$0.” The entire debacle resulted in part from the defendants’ failure to carry out the promise, made in both the LPA and the PPM, that a “Board of Advisors” would be appointed to cany out valuation and other functions for the benefit of the Limited Partners. (A Board of Advisors finally was appointed in December 2005, long after the Hyperchip investment and capital call.)
VIP has also discovered that Thekkethala and John “had interests in the Portfolio Companies in which the Fund had invested,[1] and that [they] had been involved in these companies since their inception,’’but have taken various steps to conceal or misrepresent their involvement. This is a conflict of interest, and has caused Thekkethala and John to overvalue these portfolio companies in connection with the Fund’s resultingly imprudent investments therein, proceeds of which have been used in part to pay Thekkethala’s and John’s salaries and other compensation and to further their interests as primary investors in the portfolio companies.
Finally, VIP asserts that the defendants represented in the PPM, and promised in the LPA, that the Fund’s investments in any single portfolio company would not exceed 15% of its aggregate capital commitments, and that the Fund substantially exceeded this limitation with respect to IBRIX (see footnote 1).
Additional allegations are recited as appropriate below, in the discussion of particular counts.
DISCUSSION
The Complaint asserts five Counts, as follows:
1. Violation of the Uniform Securities Act.
2. Breach of Contract.
3. Fraudulent Misrepresentation.
4. Negligent Misrepresentation/Omission.
5. Breach of Fiduciary Duty.
These are considered in turn.
1. Uniform Securities Act.
G.L.c. 110A, §410(a)(2) imposes civil liability on anyone who
offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . .
This section “provides the only civil remedy under the Uniform Securities Act for misrepresentations and omissions.” Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50 (2004), quoting J.C. Long, Blue Sky Law §9:23 (2003). Nonetheless, it “provides strong protections for a buyer who received misleading information from a seller of securities.” IcL, 442 Mass. at 52. Among other things, the Act dispenses with any requirement that the plaintiff *305 prove negligence or scienter, adopting instead an “inverse negligence standard” by which the defendant is afforded the opportunity to prove “that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.” Id., quoting Long, §9:23 at 9-35 and G.L.c. 110A, §410(a)(2). Nor need the buyer prove reliance on the misrepresentation or omission, and his “sophistication” is immaterial, provided he shows only that he was ignorant of the untruth or omission. Id., 442 Mass. at 53.[2]
A claim under section 410(a)(2) necessarily, in view of the statute’s express language, focuses on misrepresentations and/or omissions made in the offering materials or otherwise in connection with the offering and sale, not thereafter. VIP’s opposition materials focus on three subjects on which it says the offering materials made misrepresentations and/or nondisclosures:
Representations that the Fund’s investment in any single portfolio company would be limited to 15% of the Fund’s aggregate Capital Commitment, when in fact it later did so;
Representations that a Board of Advisors would be constituted to review, among other things, valuation of securities not listed on a national exchange or NASDAQ, when in fact no Board of Advisors was appointed for the first five years of the Fund’s existence; and
Nondisclosure of Thekkethala’s interest in Ratel-ntegration and of John’s interest in IBRIX.
A.15% Limitation
The PPM references in three places an anticipated 15% limitation on the Fund’s investment in any single portfolio company. The first (on p. 6) was not misleading, since it was offered merely as a “necessarily incomplete” summary of the more detailed provisions of the LPA, which the PPM attached and invited the prospective investor to read in its entirety. Under the LPA, the 15% concentration limit applied only to the three-year period beginning in February 2006. The alleged overconcentration alleged in the Complaint occurred before February 2006.[3] There was, in other words, no violation of the LPA in this respect.
The other two, however — that “(t]he General Partner expects” (p. 18) and “anticipates” (p. 19) living within this limitation, without regard to time — are statements of intent which would be misleading, if the plaintiff showed that the General Partner did not in fact hold the intent at the time it said it did. See Walling v. Beverly Enterprises, 476 F.2d 393, 396 & n.6 (9th Cir. 1973).
B.Board of Advisors
The offering materials also represented that a Board of Advisors would be formed “for the benefit of the Limited Partners,” to act as a check on the General Partner in several situations: “to advise the General Partner on conflict of interest issues”; to review the General Partner’s valuations of securities and other assets of the Fund; to carry out specified duties in case of specified contingencies (removal of the General Partner for cause, or a change in its control) not alleged to have occurred here; and “to advise the General Partner on such other matters as to which the General Partner may from time to time consult the Board of Advisors.” LPAT313.9.5, 4.6.2; PPM p. 27. No Board of Advisors was constituted until over five years later.
Although LPA 13.9.5 assigns the Board its valuation function in only one, narrow circumstance (when unlisted securities are distributed in kind to partners, which did not occur), the discussion in the PPM (p. 27) is not expressly so limited;[4] nor does this discussion appear in that portion of the PPM which merely purports to summarize the provisions of the LPA. The representations concerning this function and that concerning conflicts of interest (LPA 14.6.2) would seem — if certain of the Complaint’s other allegations (concerning overvaluation of companies in which Thekkethala and John held undisclosed interests and in which the Fund then invested) are credited — to be material.
C.Principals’ Preexisting Investments in Portfolio Companies
Finally, if Thekkethala and John actually had significant interests in companies in which they intended the Fund would invest, this was also a material fact that should have been disclosed.
For all of these reasons, the motion is denied as to Count One.[5]
2. Breach of Contract
At oral argument, VIP conceded the obvious point that its contract was with JT Venture Partners, not with Thekkethala and John individually. Count Two will therefore be dismissed as against the individual defendants.
Count Two alleges that “the Defendants violated the LPA and PPM, as a result of which the Plaintiff has been damaged.” Unlike Count One, however, the proper focus of Count Two is on the terms of the LPA, which provides in ¶ 11.8 that it constitutes the parties’ entire agreement, superseding any prior agreement or understanding among them. Thus, although representations made in the PPM may be relevant to the tort claims advanced by the plaintiffs, it is the LPA alone which embodies the contract.[6]
Viewed thus, VIP’s complaint that the Fund invested more than 15% of its assets in IBRIX fails to state a claim for breach of contract, since the only contractual commitment in this regard in the LPA pertains to follow-on investments made in the sixth through eighth years of the Fund, well after the events recited in the Complaint.
Similarly, the accusation that the Board of Advisors did not review the Fund’s valuations of unlisted securities proceeds — insofar as relevant to the facts presented here — from the representations of the PPM, not the contractual commitments of the LPA. In the LPA, the Board’s valuation role is confined to valuation of *306 unlisted securities “to be distributed in kind” to the Fund’s partners, something the Complaint does not allege occurred.
The broader contention with respect to the Board, however — that the general partner promised there would be one, but never took the necessary steps to appoint it — is more firmly grounded in the LPA, which did make this commitment in ¶4.6.1; promised that the Board would function “for the benefit of the limited partners” (id.), and specifically assigned it the task of “advis[ing] the General Partner on conflict of interest issues,” among other things. As noted above, the failure to institute this checks-and-balances mechanism can reasonably be associated with one of VIP’s bedrock complaints — that Thekkethala and John treated the Fund as the private banker for their own enterprises, not for the general good of the partnership.
The defendants maintain, however, that the contract claim is time-barred. Under Delaware law,[7] the statute of limitations for an action in contract is three years. 10 Del.C. §8106. The Delaware Supreme Court “has repeatedly held that a cause of action ‘accrues’ under Section 8106 at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.” Wal-Mart Stores, Inc. v. AIG Ins. Co., 860 A.2d 312, 319 (2004).
This seemingly emphatic pronouncement notwithstanding, the Delaware courts do toll the statute “in certain limited circumstances.” Id. One is
where the injuiy is “inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of.” In such a case, the statute will begin to run only “upon the discovery of facts ‘constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery’ of such facts.”
Id. (citations omitted). Others are fraudulent concealment, and equitable tolling for “claims of wrongful self-dealing, . . . where a plaintiff reasonably relies on the competence and good faith of a fiduciary.” In re Dean Witter Partnership Litigation, 1998 WL 442456 (Del.Ch. 1998).
A motion to dismiss is an appropriate vehicle for asserting a limitations defense where “the dispositive facts are undisputed and appear on the face of the complaint.” Whitehouse v. Town of Sherborn, 11 Mass.App.Ct. 668, 676 (1982). This can be a chancy business, however, where the particular statute of limitations is subject to fact-grounded tolling rules. Here one might surmise, from the fact that two of the three members of the Board of Advisors were to be appointed “by Consent of a majority in interest of [the] Limited Partners,”[8] that VIP likely was aware more than three years before it filed suit that no Board of Advisors had been appointed, or if not, that its ignorance likely was not “blameless.” The Complaint and the materials attached do not conclusively establish this, however. Bearing in mind “the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief,” Nader v. Citron, 372 Mass. 96, 98 (1977), the motion to dismiss must be denied as to such portion of Count Two as relates to JT Venture Partners’ failure to appoint a Board of Advisors.
3. Intentional Misrepresentation (Count Three)
Count Three asserts a claim for intentional misrepresentation. The defendants are correct that the Complaint does not plead — indeed, would seem to negate — the necessary element of reliance in connection with the alleged overvaluation of Hyperchip.[9]
For substantially the reasons discussed in connection with Count One, however, Count Three otherwise makes out the elements of a claim for fraud. These, in Delaware as in Massachusetts, are:
1) a false representation, usually one of fact, made by the defendant;
2) the defendant’s knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
3) an intent to induce the plaintiff to act or to refrain from acting;
4) the plaintiffs action or inaction taken in justifiable reliance upon the representation; and
5) damage to the plaintiff as a result of such reliance.
Stephenson v. Capono Devel., Inc., 462 A.2d 1069, 1074 (Del. 1983). The defendants’ representations that there would be a Board of Advisors; that the Board would have the valuation and advisory functions described in the LPA and the PPM; and that they intended not to cause the Fund to concentrate more than 15% of its capital in any one entity, would — assuming falsify and scienter— provide the stuff of a fraud claim. The allegation that Thekkethala and John were already invested in companies to which they intended to direct investments by the Fund fits neatly enough into the rule that a fiduciary’s silence on a matter on which he had a duty of disclosure may be styled as a fraud claim. Metro Communication Corp. v. Advanced Mobilecomm Technologies, Inc., 854 A.2d 121, 154 (Del.Ch. 2004).
As with Count Two, however, the defendants argue that Count Three is time-barred. Fraud claims are governed by the same three-year statute of limitations (10 Del.C. §8106) as contract claims. Krahmer v. Christie’s, Inc., 903 A.2d 773, 778 (Del.Ch. 2006). “A cause of action in tort accrues at the time of injury.” Kauffman v. C.L. McCabe & Sons, Inc., 603 A.2d 831, 834 (Del. 1992).
The aforementioned tolling rule for cases of fraudulent concealment, inherently unknowable injury, or claims against a fiduciary have general application, however, in both tort and contract claims. See Krahmer v. Christie’s, Inc., 903 A.2d 773, 778 (Del.Ch. 2006).[10] Count Three therefore survives the motion to *307 dismiss, to the extent it relates to the failure to appoint a Board of Advisors and to the principals’ investments in future portfolio companies.
4. Negligent Misrepresentation (Count Four)
Count Four alleges negligent misrepresentation, as a less exacting alternative to the fraud claim of Count Three. The defendants cite the Metro Communication case, 854 A.2d at 155-63, for the proposition that a claim for negligent misrepresentation — called, in Delaware, “equitable fraud” — is unavailable on the facts of this case.
Metro Communication held that an “equitable fraud” claim — that is, a claim for misrepresentation without scienter — -will not lie against a corporate fiduciary in connection with the general fiduciary duly of disclosure; that is, in relation to “disclosures . .. not connected to a specific request for the stockholders to make a discretionary voting or tendering decision.” 854 A.2d at 157. Citing Malone v. Brincat, 722 A.2d 5 (Del. 1997), the Vice Chancellor in Metro Communication held that in a general disclosure case, the plaintiff would need to prove that the defendant “knowingly disseminated false information,” and that a lesser standard would “subvert! ]” “Delaware’s carefully crafted system of regulating corporate disclosure, which takes into account the special relationship between directors and stockholders as well as the sensitive federal-state balance in this area.” 854 A.2d at 163.
Metro Communication, being from a lower Delaware court, is not binding precedent. I have reviewed the Malone case cited therein, and am not fully persuaded of the conclusions that the Metro Communications court drew from it. Malone involved allegations of intentional, even “egregious,” dissemination of inaccurate information into the marketplace, unconnected with any corporate governance issue. 722 A.2d at 8. The court held, however, that “(t]he duty of disclosure is, and always has been, a specific application of the general fiduciary duty owed by directors,” id. at 10, and that this duty is tripartite in nature:
Whenever directors communicate publicly or directly with shareholders about the corporation’s affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty. Id. (emphasis supplied).
Inaccurate information in these contexts may be the result of a violation of the fiduciary duties of care, loyalty or good faith. Id. at 11 (emphasis supplied).
The duty of directors to observe proper disclosure requirements derives from the combination of the fiduciary duties of care, loyalty and good faith. Id. (emphasis supplied).
* * *
When the directors disseminate information to stockholders when no stockholder action is sought, the fiduciary duties of care, loyalty and good faith apply. Dissemination of false irformation could violate one or more of those duties. Id. at 12 (emphasis supplied).
It therefore appears to me that Delaware law may permit a claim for negligent misrepresentation against a corporate fiduciary, even where the allegedly false statement was made in connection with a stock offering rather than a request for shareholder action.
Count Four, however, is otherwise flawed. The PPM’s statements relating to limits on concentration and appointment of a Board of Advisors were (to the extent they went beyond the contract terms of the LPA) statements of intention, actionable only if the defendants did not actually hold the intent they said they had; this could be intentional fraud, but it could not be negligence. Similarly, the principals must have known (if it was true) that they were invested in companies to which they intended to infuse with capital from the Fund. Finally, the plaintiffs lack of reliance on the inflated Hyperchip valuation is as fatal to this aspect of Count Four as it is to Count Three. Count Four will therefore be dismissed.
5. Breach of Fiduciary Duty (Count Five)
Count Five asserts a claim for breach of fiduciary duty. This presumably relates to conduct occurring after VIP made its investment and the fiduciary relationship began; i.e., principally to the Hyperchip, IBRIX, and Ratelntegration investments.
The defendants’ principal attack on Count Five proceeds from the common-sense proposition that actions that are expressly authorized by the LPA cannot be the subject of a claim for breach of fiduciary duly. See 6 Del.C. §17-1101(c) (“To the extent that... a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner . . . the partner’s or other person’s duties may be expanded or restricted or eliminated by provisions in the partnership agreement”); Sonet v. Timber Co., L.P., 722 A.2d 319, 323 (Del.Ch. 1998) (“When a particular limited partnership has plainly opted out of the statutory default scheme, judicial review, in my opinion, must look to the limited partnership’s distinct doctrinal foundation in contract theory”). The LPA, the defendants say, permitted the sort of involvement in portfolio companies by the General Partner and its principals as is alleged here, and that involvement therefore is not actionable.
Paragraph 4.7.3 of the LPA provides, in pertinent part:
The General Partnership may in its sole discretion permit principals and Affiliates of the General Partner to co-invest with the Partnership in its investments with Portfolio Companies (including Follow-On Investments) in an aggregate amount which, when added to the General Partner’s Capital Contribution with respect to a Security will not exceed two percent (2%) of the aggregate purchase price of any such security . . . [T|he co-investment shall be made on the same *308 terms, at the same price and in the same securities that are being purchased by the Partnership.
The Complaint, however, alleges conduct going far beyond what this clause permits. John is said to be “IBRIXs primary investor,” and his and Thekkethala’s interests in portfolio companies are said to have been undisclosed and to date “from their inception,” which led the defendants to invest further Fund capital in these companies based on overstated valuations. Nothing in paragraph 4.7.3, or elsewhere in the LPA, permitted this.[11]
The defendants argue that VIP lacks standing to complain of the IBRIX investment because this occurred in 2006, long after VIP refused the 2003[12] capital call and was barred, under paragraph 2.7.5 of the LPA, from receiving distributions and allocations from any investments made thereafter. It might be so, but I cannot so conclude from the face of the Complaint, which mentions the 2006 investment but also alleges that the Fund had invested $3.5 million in Ratelntegration and over $8.5 million in IBRIX“[i]n the past several years, ... excluding the funds sought. . . in connection with the 2006 capital call.”
Finally, I note that if the Hyperchip valuation resulted from a breach of fiduciary duty, Count Five states a claim concerning it even though VIP refused the capital call, since the Complaint alleges other financial loss resulting from the application of LPA 12.7.5. Count Five, insofar as it relates to the Hyperchip, IBRIX, and Ratelntegration investments, therefore survives the motion to dismiss.
6. Conclusion.
Just as “past performance is no guarantee of future results,” the denial of a Rule 12(b)(6) motion — in which the Court accepts as true the allegations of the Complaint and does no weighing of the evidence — is not necessarily a predictor of ultimate success on the merits. That said, much of this case lives to fight another day.
ORDER
For the foregoing reasons, the defendants’ Motion to Dismiss is ALLOWED IN PART and DENIED IN PART. Those claims which survive the motion are as follows.
Count One: Concentration of investments; Board of Advisors; principals’ preexisting investments in portfolio companies.
Count Two: Board of Advisors (JT Venture Partners only).
Count Three: Concentration of investments; Board of Advisors; principals’ preexisting investments in portfolio companies.
Count Four: None.
Count Five: Concentration of investments; Board of Advisors; principals’ preexisting investments in portfolio companies; Hyperchip investment.

Specifically named are companies called IBRIX and Rate-Integration.

As the Marram opinion (442 Mass. at 54-55), the Act also contains provisions thought to favor sellers: a four-year statute of limitations with an “inquiry notice” accrual principle; defenses based on the buyer’s actual knowledge or the seller’s actual and reasonable ignorance: and limitation of damages to a rescissory measure plus six percent interest; no multiple or punitive damages are allowed.

Although the Complaint references a “year 2006 capital call” for an IBRIX investment, it appears that this had occurred before February 2006. See Exhibit I to the original Complaint, p. 5.

“A11 [unlisted] securities and any other assets of the Partnership will be valued by the General Partner in good faith after a review with the Board of Advisors.”

The Act has a four-year statute of limitations, G.L.c. 110A, §410(e), and an “inquiry notice” standard for accrual, meaning that the plaintiff must bring suit not later than four years “from the time a reasonable investor would have noticed something was 'amiss.' ” Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 54 n.20 (2004). The defendants do not appear at this juncture to press a limitations defense as to Count One.

I read the Delaware cases as respecting integration clauses insofar as they apply to claims in contract, but as permitting a fraud or other tort claim based on pre-contract representations unless the integration clause expressly states that the plaintiff has not relied on any such representations. See, e.g., Rhodes v. Silkrood Equity, 2133-VCN (Del.Ch. 7/11/07) at n.24 & accompanying text; Kronenberg v. Katz, 872 A.2d 568, 592-93 (Del.Ch. 2004). There is no such “anti-reliance” language in the LPA.

The parties agree that only Count One is governed by Massachusetts law. All other counts, both by virtue of a choice-of-law provision in the LPA and by analogy to Harrison v. NetCentric Corp., 433 Mass. 465, 471 (2001), are governed by the law of Delaware.

LPA ¶4.6.1. “Consent” is defined to include a vote taken at a meeting, or a prior written approval. OT8.1 and Art. Ten.

tyhe Complaint alleges that other investors were duped into responding to the capital call for the Hyperchip investment and that VIP, though it did not so respond, was nonetheless damaged through the forfeiture of 25% of its interest. Delaware law, however — like Massachusetts law — provides that “to maintain a claim for fraud the plaintiff must allege that the defendant, with intent to deceive, misrepresented a known fact upon which the plaintiff reasonably relied to [its] detriment.” Simons v. Cogan, 549 A.2d 300, 304 (Del. 1988) (emphasis supplied).

At the same time, I note that Krahmer and other cases bespeak a fairly exacting approach, in Delaware law, to these tolling doctrines, and particularly to the plaintiffs duly of reasonable diligence in ascertaining and then pursuing its claim.

I note that the claim that the Fund’s investments were overconcentrated in IBRIX may also state a claim for breach of fiduciary duty. Although the LPA’s 15% limitation did not kick in until February 2006, the LPA does not otherwise endorse any particular level of concentration. The allegation that the individual defendants directed substantial amounts of Fund capital to a company in which the individual defendants held substantial, prior, and undisclosed interests states a claim for breach of the fiduciary duties of loyalty and good faith, as does the defendants’ failure to submit themselves to the contractually mandated scrutiny of a Board of Advisors.

This is the allegation in the Complaint. Defendants’ brief refers to both 2003 and 2001.