R.S.M. INC. and Mel Mohr, Trustee for the Irene Mohr Revocable Trust on behalf of themselves and all others similarly situated, Plaintiffs,

v.

ALLIANCE CAPITAL MANAGEMENT HOLDINGS L.P., Alliance Capital Management Corporation, Alliance Capital Management, L.P., Dave H. Williams, Bruce W. Calvert, Robert H. Joseph, Jr. and John D. Carifa, Defendants.

Civ. A. No. 17449.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 14, 2001.
Decided: April 10, 2001.
Revised: Nov. 8, 2001.

Craig B. Smith, David A. Jenkins, and Joelle E. Polesky, of Smith, Katzenstein & Furlow, Wilmington; Stuart D. Wechsler, Frederick W. Gerkens, III, of Wechsler Harwood Halbian & Feffer, New York, New York, of counsel, for Plaintiffs.

Charles F. Richards, Jr., Srinivas M. Raju, J. Travis Laster, of Richards, Layton & Finger, Wilmington; Dennis Glazer, of Davis Polk & Wardwell, New York, New York; Leon P. Gold and Scott A. Eggers, of Proskauer Rose, New York, New York, of counsel, for Alliance Capital Management Holding, L.P., Alliance Capital Management Corporation, Alliance Capital Management L.P., Dave H. Williams, Bruce W. Calvert and John D. Carifa.

## OPINION

STRINE, Vice Chancellor.

This action involves a challenge to the already-consummated reorganization of a limited partnership. The "Reorganization" separated the ownership of a single publicly traded limited partnership, Alliance Capital Management Holdings, L.P. ("Holdings") into two parts: Holdings and a new privately traded partnership, Alliance Capital Management L.P. ("Capital"). Holdings unitholders were given the option to convert their Holdings units into Capital units in the Reorganization. If they did so, their units would be exempt from a federal tax that applied to publicly traded units, but would not be freely tradeable. This tradeoff between favorable tax treat-

ment and liquidity did not apply to Holdings' majority unitholder, Equitable Life Assurance Company of America ("Equitable"), which is the sole owner of Holdings' general partner.

Thus, the plaintiffs have alleged that the Reorganization was intended for the sole benefit of Equitable and was structured and disclosed in a manner that was purposely intended to minimize the number of public unitholders who would exchange their Holdings units for Capital units. By minimizing the number of public unitholders who converted, Equitable could thereby convert all the units it wished to exchange.

In their complaint, the plaintiffs allege that: (1) the Reorganization is invalid because it was approved by a majority of the public unitholders rather than by unanimous action; (2) the defendants breached their fiduciary duties by structuring the Reorganization in a manner that was unfair to the public unitholders; and (3) the defendants procured an affirmative vote of the public unitholders through materially misleading disclosures.

The defendants have moved to dismiss these claims, and have raised numerous arguments that cannot be efficiently summarized here. For the reasons articulated herein, I grant most aspects of the defendants' motion, but deny it in two important respects.

### I. *Factual Background* [1]

#### A. *The Parties*

Plaintiffs R.S.M., Inc. and Mel Mohr were unitholders of Holdings before the Reorganization and continue to hold their units.

---

1. The facts are derived from the amended complaint or the attachments thereto, with one exception discussed later in the opinion.

Defendant Holdings is a publicly traded limited partnership listed on the New York Stock Exchange ("NYSE"). Defendant Capital is a privately traded limited partnership, and Holdings owns the second-largest block of its units.

Defendant Alliance Capital Management Corporation (the "General Partner") is a Delaware corporation and general partner of both Holdings and Capital. The General Partner is a wholly-owned subsidiary of Equitable. Before the Reorganization at issue in this case, Equitable owned a majority of the units in Holdings. After the Reorganization, Equitable became the majority unitholder of Capital.

The other defendants named in the amended complaint are directors and/or officers of the General Partner.

### B. The Ownership Structure Of Holdings Before The Reorganization

As of the time of the Reorganization, Holdings was a formidable player in the mutual fund and asset management industry and was controlled as follows:

### C. The Motivation For The Reorganization

In the late 1990's, publicly traded limited partnerships like Holdings faced a deadline by which their favorable tax treatment as partnerships would be eliminated. On August 5, 1997, a federal statute was enacted to provide some limited relief to these partnerships. The Taxpayer Relief Act of 1997 permitted publicly traded limited partnerships to maintain partnership tax status if they elected to pay a tax, beginning January 1, 1998, of 3.5% on gross business income.

As a result, Holdings faced a new dilemma: how to balance the relative economic utility of avoiding the 3.5% tax versus the benefits of liquidity for unitholders. By converting the partnership into a private one that was not traded on an exchange, Holdings could avoid the 3.5% tax. But this action would require the partnership to subject itself to stringent limitations on the transferability of units, limitations that would place unitholders in a far different situation than being holders of units freely tradeable on a major stock exchange.

As shall be seen, this tradeoff in values was one that was more difficult for the public unitholders than for Equitable. Due to the magnitude of Equitable's position in Holdings, it was largely exempt from the federal strictures on transferability that would apply in the event that the partnership chose a structure to avoid the 3.5% tax. In essence, Equitable had the

opportunity to avoid both the tax and any markedly increased risk of illiquidity.

### D. *The Basic Elements Of The Reorganization*

In April 1999, the General Partner announced its plan for addressing the choice posed by the new 3.5% tax. At its core, the plan involved splitting Holdings into two affiliated entities. One entity—Holdings itself—would continue to be a publicly traded limited partnership and be subject to the 3.5% tax.[2] The other entity—Capital—would be a private partnership exempt from the 3.5% tax. Capital's units would be subject to strict federal limits on transferability.

In the Reorganization, Capital would purchase all the assets and businesses of Holdings in exchange for all of the units of Capital. Capital would thus become the operating entity, with Holdings being a holding vehicle for those unitholders who valued liquidity enough to subject themselves to the 3.5% tax.

The Reorganization was structured to give unitholders a chance to decide which entity's units they wished to hold. Thus, Holdings unitholders were given the opportunity to exchange their units—on a one for one ("1:1") basis—for units of Capital (the "Exchange").

Because it could convert its Holdings units into Capital units without any loss of liquidity, Equitable wanted to exchange all of its Holdings units to avoid the 3.5% tax. As plaintiffs point out, however, Equitable's ability to do that was affected by the number of public unitholders who made the same choice.

If approximately 30% of the public unitholders made this election, Equitable's ability to convert would be subject to proration on an equal basis with the public unitholders. The reason for this was that without a limitation on the number of units exchanged by public unitholders, Holdings could have been left without a sufficient number of units to maintain its listing on the NYSE.

According to the plaintiffs, Equitable wanted to exchange as many of its units as it could and thus had a financial motive to deter public unitholders from electing to do so. As a result, the plaintiffs contend that the General Partner intentionally structured the Reorganization in a manner calculated to produce the result that Equitable, its owner, desired.

The plaintiffs also point out that Equitable faced a pickle. Although the Reorganization was obviously beneficial to it, the Reorganization had less promise to public unitholders because they faced the trade-off between tax relief and liquidity. And as noted, Equitable had an incentive to limit the number of converting public unitholders to no more than 30%, so as to be able to convert all the units it desired to convert. But the Holdings' partnership agreement prevented Equitable from accomplishing the Reorganization without the affirmative votes of a majority of the public unitholders unaffiliated with Equitable. Thus, the General Partner and Equitable had to come up with a way to sell the transaction to public unitholders who arguably had little to gain from it.[3]

---

2. Holdings was actually the limited partnership called "Alliance Capital" before the Reorganization. For simplicity's sake, I treat Holdings as if its name never changed.

3. The plaintiffs do not argue that a general partner would breach its fiduciary duties simply by proposing a unit exchange transaction that benefited one group of holders at no harm to the others. Such a proposal would be economically optimal. *Cf.* MODERN DICTIONARY FOR THE LEGAL PROFESSION 609 (Kenneth R. Redden & Gerry W. Beyer eds., 1993). (under the doctrine of Pareto optimality, a change should be made if it

According to the plaintiffs, the General Partner and Equitable designed a strategy that was purposely intended to induce the public unitholders to approve the Reorganization while discouraging them from participating in the Exchange. This strategy, plaintiffs contend, was successful in inducing a majority of the public unitholders of Equitable on September 22, 1999 to approve: (1) a restated and amended partnership agreement for Holdings containing changes necessary to effect the Reorganization; and (2) the Reorganization itself. The plaintiffs argue that this approval is insufficient to sustain the Reorganization for a variety of reasons, the most important of which I will next detail, beginning with plaintiffs' claim that the unitholders' vote was induced by a deceptive and coercive strategy implemented by the defendants in breach of their fiduciary duties.

E. *Do As I Say, Not As I Do?: The Alleged Strategy To Induce Public Unitholders To Approve The Reorganization, And To Refuse To Participate In The Exchange*

The defendants' illicit strategy had two basic elements: (1) limiting the liquidity afforded to small unitholders of Capital even more than was required by federal law and stressing the risks that illiquidity presented; and (2) leading public unitholders to believe that the Reorganization would benefit them regardless of whether they converted their units in the Exchange. By this method, plaintiffs argue, Equitable led the public unitholders to believe that they gained from the Reorganization even if they did not convert, leaving Equitable as the only real beneficiary of the Reorganization.

I now describe these two basic elements as articulated by the plaintiffs' complaint.

1. *The Limitations On Liquidity*

If public unitholders exchanged their units for Capital units, they were subject to a number of contractual provisions in Capital's partnership agreement limiting the transferability of their units. The plaintiffs acknowledge that it was impossible for Capital to avoid the 3.5% tax without substantial limitations on transferability.

What the plaintiffs argue, however, is that the General Partner and Equitable intentionally limited the transferability of Capital units well beyond the degree necessary to safely protect favorable tax treatment. Without burdening the reader with unnecessary complexity, suffice it to say that the plaintiffs point to regulatory safe harbors that Capital could have used to afford liquidity to small unitholders. These include a safe harbor that permits private partnerships to enable transfers of up to 2% of the partnership's units each year without endangering its tax exemption.[4]

Instead, Capital's partnership agreement subjected transfers proposed by small holders to a large number of conditions, including payment of Capital's legal fees and other costs involved with the transfer. Notably, such transfers were subject to approval not just by the General Partner, but by Equitable itself.

would make one party to an economic relationship better off without making another party worse off). But the plaintiffs argue that a general partner may not lead all unitholders to believe they have something to gain when that is not true, and may not skew the transaction so as to discourage unitholders not affiliated with the general partner's parent from participating in the unit exchange in order to maximize the parent's own opportunity to participate.

4. Pls.' Br. at 40 n. 18 (*citing* Treas. Reg. § 1.7704–1(j)(1)).

By contrast, Equitable faced no liquidity problem. Capital's partnership agreement required the General Partner to assent to any "block transfer" of more than 2% of the Capital units. Because Equitable was the only holder with more than 2% of the units, it was the only unitholder with this option.

As plaintiffs see it, Equitable thus structured the transferability provisions of Capital's partnership agreement so as to discourage public unitholders from taking part in the Exchange. This discouragement protected Equitable from the risk of proration.

### 2. The Benefits That Non–Exchanging Public Unitholders Were Told They Would Receive

According to plaintiffs, Equitable faced a quandary that it resolved in a manner contrary to the meaning of its own name. Holdings' financial advisor, Goldman Sachs, originally advised Equitable that a 1:1 exchange ratio would provide no benefit to the public unitholders of Holdings. That is, Goldman Sachs could not discern any benefit from the Reorganization for Holdings' public unitholders who did not participate in the Exchange. And because of the restrictions on liquidity that had to be accepted in return for participation in the Exchange, Goldman Sachs appears to have believed that the value of the reduction in tax liability offered by a 1:1 exchange was outweighed by the corresponding diminution in liquidity. Thus, Goldman Sachs would not opine that public unitholders would benefit by exchanging their units.

In order to address the fact that Goldman Sachs could not discern a Reorganization-generated benefit to the public un-

itholders, Equitable entered into a new advisor agreement with Capital, which in simple terms guaranteed that from 1999 through 2003 Capital would receive at least $38 million in advisory fees (the "Guaranteed Fee") annually. Because Holdings unitholders would share proportionally in the benefits of these fees to Capital, the guaranteed fee was thus of arguable benefit to non-exchanging Holdings unitholders.

The Guaranteed Fee Agreement was subject to termination by Equitable in certain circumstances. In that event, however, a separate accounting, valuation, reporting and treasury services agreement between Equitable and Capital would be deemed to have automatically terminated, giving rise to an obligation on the part of Equitable to pay a termination fee ("Termination Fee").[5] The Termination Fee would vary depending on the date of termination. If, for example, Equitable terminated in 1999, the Termination Fee would be $80 million, but if it waited until 2003, then the Termination Fee would only be $10 million.[6]

In the proxy materials distributed in connection with the unitholder vote on the exchange, the public unitholders were informed of an asset management fee analysis that had been performed by Goldman Sachs. This analysis calculated that the Guaranteed Fee Agreement added between twenty-seven and sixty-four cents per unit in value to Holdings' public unitholders based on a discounted cash flow analysis of the Fees that would be received from 1999–2003.[7] The unitholders were further told that:

> Based on the asset management fee analysis, Goldman Sachs concluded that

---

**5.** Proxy at 4, 92.

**6.** *Id.* at 4, 49.

**7.** *Id.* at 48–49.

the holder of a unit who does not participate in the exchange offer should be better off economically after the reorganization than before the reorganization because the one-for-one exchange ratio ensures that such unitholder will retain the same economic interest after the reorganization, while such interest will be enhanced by the incremental benefits accruing to Alliance Capital as a result of the minimum required fee payments.[8]

The complaint argues that this description of Goldman Sachs' analysis was grossly misleading. According to plaintiffs, the Guaranteed Annual Fee of $38 million was (i) substantially less than the annual fees paid to Holdings in each of the prior five years; and (ii) substantially less than the annual fees Holdings was internally projecting it would receive from Equitable during the years 1999–2003. These facts were particularly material, say plaintiffs, because there was virtually no risk that Equitable would have ever ceased using Holdings (or, more accurately, Capital, after the Reorganization) to perform these services. Because (i) Goldman Sachs found that the fees charged by Holdings had been at typical industry levels and (ii) Equitable would own a majority of Capital after the Reorganization and thus be able to recoup a large portion of the fees through its return on its units, plaintiffs assert that it would have been foolish for

Equitable to go elsewhere for these services.

For all these reasons, the plaintiffs argue that the Proxy was written to make it appear as if the Guaranteed Fee delivered substantial incremental value to Holdings on the order of $38 million annually on a discounted basis, when in reality the Guaranteed Fee and the Termination Fee were at best far more modestly valuable insurance policies against a highly unlikely risk.[9] Put bluntly, plaintiffs contend that the Proxy turned revenues that were already built into Holdings financial projections into additional financial value. Equitable's alleged motive for this assertedly misleading portrayal was to induce the public unitholders to approve a Reorganization that would benefit only Equitable itself.

This inducement was important, plaintiffs claim, because it worked in tandem with the Proxy's emphasis on the illiquidity risks that exchanging public stockholders would face. Indeed, plaintiffs emphasize that Goldman Sachs refused to opine whether a public unitholder who elected to participate in the exchange would benefit from the Reorganization.

### F. The Partnership Amendments Necessary To Effect The Reorganization

The plaintiffs' multi-pronged attack on the Reorganization includes an assertion

---

8. Amended Compl. ¶ 38 (*quoting* Proxy at 49).

9. The amended complaint alleges that the Proxy did not fairly disclose the interrelationship of the Guaranteed Fee Agreement and the Termination Fee. Indeed, the amended complaint makes the strange argument that the Proxy hid the value of the Termination Fee in order to avoid undermining the Proxy's insinuation that the Guaranteed Fee was highly valuable.

The plaintiffs' argument that the Termination Fee's relationship to the Guaranteed Fee is not adequately disclosed is plainly wrong. *See* Proxy at 4, 92. It is easy for the reader to tell that if the Guaranteed Fee Agreement were terminated by Equitable, that would have the effect of triggering the Termination Fee. Without further discussion, therefore, I hereby grant the defendants' motion to dismiss the aspect of plaintiffs' disclosure claim that is based on the defendants' alleged failure to disclose the material facts regarding the Termination Fee.

that the Reorganization was not accomplished by a valid amendment to the Holdings' partnership agreement that existed before the Reorganization (the "Original Agreement"). The basic contention they make is that the Reorganization is invalid because it was accomplished by a single amendment to the Original Agreement (the "Amendment") that was approved by a majority of the public unitholders rather than by a unanimous vote of all the unitholders. Because the Amendment that was voted on by the Holdings unitholders contained a single provision that could only be accomplished by a unanimous vote, the plaintiffs argue that the entirety of the Amendment, which was otherwise approved by a sufficient vote, was never validly adopted and must be declared void.

Understanding this argument naturally requires reference to specific provisions of the Original Agreement, and the objectives sought to be accomplished by the Amendment to that Agreement. In essence, the Amendment that was proposed in connection with the Reorganization was designed to clear the way for the Reorganization itself. That is, the Amendment proposed changes to the Original Agreement that were necessary or advisable in order to effect the Reorganization itself, which was to be the subject of a separate vote by the Holdings unitholders.

The Amendment was put to the Holdings unitholders as one ballot proposal in the form of a proposed restated and amended partnership agreement (the "Proposed Agreement"), which was followed by the separate proposal on the Reorganization itself. In order for either the Amendment or the Reorganization to take place, an affirmative vote on both was required.

The Holdings unitholders were told that the Reorganization would be approved if it were supported by a majority of the unitholders unaffiliated with Equitable or the General Partner. This instruction was consistent with § 6.13 of the Original Agreement, which reads as follows:

> Notwithstanding any other provision of this Agreement, the General Partner shall not cause the Partnership to sell, transfer, pledge, assign, convey or otherwise dispose of, in a single transaction or series of related transactions, all or substantially all of the Partnership Assets (other than pursuant to Section 2.6) unless (A)(i) such sale, transfer, pledge, assignment, conveyance, or other disposition has received Majority Approval (Majority Outside Approval if the General Partner or any of its Corporate Affiliates have any direct or indirect equity interest in any Person acquiring Partnership Assets in such transaction) . . . . [10]

Because the Reorganization involved the transfer of substantially all the assets of Holdings to Capital, it triggered this protective provision of the Original Agreement.

The unitholders were also told that so-called "Majority Outside Approval" was necessary to adopt the Amendment, in addition to approval by a majority of all unitholders, including Equitable. The defendants argue that Majority Outside Approval was sought for the Amendment because it was in reality part and parcel of the Reorganization, and therefore was also subject to § 6.13. And Majority Outside Approval was in fact secured from the public unitholders in the September 22, 1999 vote on the Amendment and Reorganization.

10. Original Agreement § 6.13.

The plaintiffs contend that the Proxy inaccurately described the vote required to effect the Amendment. Among the changes to the Original Agreement proposed in the Amendment was a change to § 15.1(b). That section provided that if any one of four categories of events identified in § 15.1(a) occurs, a dissolution of Holdings may be avoided only by a unanimous vote of the unitholders. Section 15.1(b) of the Proposed Agreement contained in the Amendment eliminated one of the four categories of dissolution in § 15.1(a) from coverage by § 15.1(b).

More importantly, for purposes of this motion, § 15.1(b) of the Proposed Agreement also replaced the unanimous vote requirement of § 15.1(b) of the Original Agreement with a majority vote. As a result, § 15.1(b) of the Proposed Agreement had an arguably profound effect on the vote required to adopt the Amendment. Under the Original Agreement, the following provisions bear on the proper vote requirement for the Amendment:

> Section 17.2. *Amendment Procedures.* Except as provided in Sections 17.1 [dealing with certain amendments that could be unilaterally made by the General Partner] and 17.3 [set forth below], all amendments to this Agreement shall be made in accordance with the following requirements:
>
> (a) Any amendment to this Agreement may be proposed by the General Partner by submitting the text of the amendment to all Limited Partners and Unitholders in writing.
>
> (b) If an amendment is proposed pursuant to subsection (a) above, the General Partner shall call a meeting of the Unitholders to consider and vote on the proposed amendment unless, in the Opinion of Counsel, such proposed amendment would be illegal under Delaware law if approved. Subject to Section 17.3, a proposed amendment shall be effective upon approval by the General Partner and Majority Approval unless otherwise required by law. The General Partner shall notify all Unitholders upon final approval or disapproval of any proposed amendment.
>
> Section 17.3 *Special Amendment Requirements.* Notwithstanding the provisions of Sections 17.1 and 17.2,
>
> (a) If any amendment to this Agreement would by its terms adversely alter the rights and preferences of any class or series with respect to distributions or otherwise materially and adversely alter the rights and preferences of any class or series, ... such amendment shall become effective only upon (i) Majority Outside Approval (in addition to approval of the General Partner) ....
>
> (b) *No provision of this Agreement which establishes a percentage of the Partners (or a class or series thereof) required to take any action shall be amended, altered, changed, repealed or rescinded in any respect that would have the effect of changing such percentage, unless such amendment is approved by a written approval or an affirmative vote of Partners (or a class or series thereof) constituting not less than the number required by the voting requirement sought to be reduced.*[11]

As the defendants do not dispute, the proposed change to § 15.1(b) was incorporated in the single Amendment put to the unitholders for approval by Majority Outside Approval. The plaintiffs therefore argue that § 17.3 of the Original Agreement

11. Original Agreement §§ 17.2, 17.3 (emphasis added).

plainly renders the Amendment invalid because § 17.3 clearly states that the unanimous vote requirement in § 15.1(b) of the Original Agreement could not be "amended, altered, changed, repealed or rescinded in any respect that would have the effect of changing such percentage, unless such amendment" is approved by a unanimous vote. Because "such amendment"—the omnibus Amendment, the plaintiffs contend—was not approved by a unanimous vote, the plaintiffs argue that the entire Amendment encompassing the Proposed Agreement, and not just the proposed change to § 15.1(b) incorporated therein, was not validly adopted.

By contrast, the defendants contend that the only effect § 17.3 had on the Amendment was to invalidate the proposed change to § 15.1(b). They base that contention on § 17.3 itself, which states that no provision establishing a particular percentage vote for certain action (*i.e.,* § 15.1(b)) can be amended unless "such amendment" (*i.e.,* the specific change to a provisions involving a super-majority vote requirement) receives that same percentage vote (*i.e.,* a unanimous vote). Therefore, the defendants claim that § 17.3 sets forth its own remedy, which is limited to invalidating the portion of the Amendment that would alter a contractually specified percentage for action (*i.e.,* the unanimous vote requirement of § 15.1(b)) without the support of the same percentage of unitholders.

That this is the intent of the Original Agreement, argues the defendants, is made plain by the severability provisions of both the Original Agreement and the Proposed Agreement (the "Severability Clauses"), both of which identically state:

Section 18.12 *Invalidity of Provisions.* If any provision of this Agreement is or becomes invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not be affected hereby.[12]

The Severability Clauses, in defendants' view, represent the clear intent of the parties to the Original Agreement and the Proposed Agreement that technical defects in particular parts of the Amendment would not operate to invalidate the other aspects of the Amendment. This practical approach must be given heavy weight, defendants say, in any decision regarding the validity of the Amendment.

Before delving into the merits of the plaintiffs' various claims and the defendants' arguments as to why they should be dismissed, it is necessary to discuss an unusual post-vote development that is material to the resolution of this motion.

G. *The General Partner Strips The Proposed Agreement Of The Proposed Change To § 15.1(b) And Certain Other Provisions When It Restates The Original Agreement*

In sharp contrast to how cases like this typically proceed, the plaintiffs did not file their initial complaint until a week after the Amendment and Reorganization were approved at a meeting of the Holdings unitholders. Thus, the defendants were not on notice of the plaintiffs' challenges to specific provisions of the Amendment, the Reorganization, and the Proxy until it was too late to alter those provisions before the vote.

The original complaint was filed before the Reorganization was consummated and the court scheduled expedited proceedings to address the plaintiffs' claims. The proceedings were cancelled by the parties when they made progress towards settle-

**12.** Original Agreement § 18.12; Proposed Agreement § 18.12.

ment. A memorandum of understanding was eventually signed in contemplation of settlement, which was subject to confirmatory discovery. This prospect of peace ultimately did not bear fruit.

Nonetheless, the filing of the complaint did influence the final form in which the Original Agreement was amended. Rather than implement every provision of the Amendment that had been voted upon by the unitholders, the General Partner excised certain aspects of the Amendment that were challenged in the plaintiffs' original complaint.

For example, the General Partner did not incorporate the proposed change to § 15.1(b) in the final "Restated Agreement," which became effective on October 15, 1999. Instead, the General Partner included in that Restated Agreement a provision identical to § 15.1(b) of the Original Agreement.

The defendants contend that there are two equally effective bases for this decision. First, the defendants claim that the General Partner simply recognized that § 17.3 of the Original Agreement had the effect of invalidating the proposed change to § 15.1(b), and thus did not include that proposed change in the Restated Agreement. Second, the defendants argue in the alternative that such a post-vote amendment was authorized by § 17.1 of both the Original and Proposed Agreements, both of which authorize the General Partner to unilaterally adopt an amend-

ment that (i) does not adversely affect the Unitholders in any material respect; or (ii) is necessary or desirable to correct any ambiguity in the partnership agreement or any provision that may be defective or inconsistent with any other provision of the partnership agreement.[13]

The General Partner also changed other provisions of the Proposed Agreement in order to address concerns raised by the plaintiffs' original complaint. These sections of the Proposed Agreement were alleged by plaintiffs to have had a material adverse effect on the rights of the public unitholders, and thereby to render the Proxy's assertion that the Proposed Agreement had no such effects false and misleading. For the reader's sake, these changes will be set forth in a later portion of this opinion addressing plaintiffs' disclosure claims.

## II. *Legal Analysis*

■ The defendants' motion is governed by well-settled procedural standards.[14] Those standards require me to accept all well-pled allegations in the amended complaint as true and to draw all inferences from those allegations in the light most favorable to the plaintiffs. In accordance with the parties' agreement, I may consult the Restated Agreement in order to resolve this motion, but the record is otherwise limited to the amended complaint and the documents incorporated therein.[15]

---

**13.** Original Agreement § 17.1(d), (g); Proposed Agreement § 17.01(d), (h). The defendants also rely on § 17.01(g) of the Proposed Agreement which gives the General Partner the authority to adopt an amendment that is necessary or desirable to conform the provisions of the Proposed Agreement with the provisions of the Original Agreement.

**14.** *See, e.g., In re Tri–Star Pictures, Inc. Litig.,* Del.Supr., 634 A.2d 319, 326 (1993) (articulating Rule 12(b)(6) standard).

**15.** Because the Restated Agreement is not incorporated in the amended complaint, the defendants' motion may technically be considered one for summary judgment. The plaintiffs admit that it has no need for discovery to respond to the implications of the Restated Agreement. *Compare In re Santa Fe Pac. Corp. Shareholder Litig.,* Del.Supr., 669 A.2d 59, 68–69 (1995). In fact, the plaintiffs have had substantial discovery. In my view, it is also appropriate to take judicial notice of an entity's governing instruments in an entity-

A. *The Plaintiffs' Claim That The Failure To Obtain A Unanimous Vote For The Amendment Invalidates The Whole Amendment And Not Just The Proposed Change To § 15.1(b)*

■ The defendants contend that the General Partner's decision to remove the proposed change to § 15.1(b) from the Restated Agreement acts as a full cure to any harm threatened by its inclusion in the Amendment. As such, the defendants argue that the plaintiffs' challenge to the Reorganization on this ground has been mooted. The plaintiffs claim that there is no cure to this problem other than a new vote.

As noted earlier, the effect that the proposed change to § 15.1(b) of the Proposed Agreement has on the validity of the Restated Agreement poses an interesting question:

> When a portion of a single amendment to a partnership agreement can only be adopted by a unanimous vote, does the failure to obtain that vote invalidate the other portions of the amendment even if those other portions otherwise received enough votes to have supported their adoption if they had been voted upon separately and even if there is reliable evidence that the electorate intended the amendment's provisions to be severable?

The plaintiffs' argument in support of the affirmative side of this question rests on formalism. As a traditional matter, plaintiffs note, it is the case that the necessary vote for final adoption of an omnibus amendment or bill is set at the highest level necessary to enact any portion of the amendment or bill. That is, if a bill contains ten sections which may be adopted by a majority vote and one section that may only be adopted by a three-quarters vote, the parliamentarian will, if the issue is identified, identify the bill as requiring a three-quarters vote for passage.[16] Thus, plaintiffs contend that it is obvious that the Proposed Agreement required a unanimous vote because the Amendment contained the proposed change to § 15.1(b).

What the plaintiffs' approach lacks, however, is any practicality. The process of amending a partnership agreement or a statute often involves multiple issues of more than minor intricacy, creating a large potential for honest human error. Not uncommonly, reasoned arguments can be made on both sides of the question whether a provision in an amendment to an agreement, certificate of incorporation, or statute requires a super-majority vote. Likewise, it is often the case that changes to instruments of this nature are voluminous and involve more than one drafter, and thus involve the risk that a provision of no material importance could be inserted deep in the text of the document which had the unconsidered effect of elevating the required vote. As a result, if a formalistic approach were taken that had the effect of invalidating the whole of an amendment based on a technical default in a single provision, the virtues of its rigor could be seen as miniscule in comparison to the injury that approach would work

law case. *See* D.R.E. 201; *Green v. Phillips,* Del.Ch., C.A. No. 14436, 1996 WL 342093, mem. op. at 13 n. 7, Jacobs, V.C. (June 19, 1996) (taking judicial notice of certificate of incorporation that was not attached to complaint or referenced therein). In any event, the defendants have not disputed that the complaint's non-conclusory allegations must be accepted as true, and have only asked the court to consider the Restated Agreement's implications for those allegations.

16. I take judicial notice that this is the practice in the Delaware General Assembly. That practice is also reflected in the court's holding in *State ex rel. Morford v. Emerson,* Del.Super., 10 A.2d 515, 521 (1939), *aff'd,* Del.Supr., 14 A.2d 378 (1940).

upon the rational functioning of the affected organizations and constituencies.

For these reasons, the law has developed mechanisms to address problems like the one this case presents in a more sensible fashion. One primary tool for doing so is the respect that the law accords to severability provisions. This respect is illustrated by the reasoning of *State ex. rel. Morford v. Emerson.*[17] In *Emerson,* the Superior Court faced a challenge to the validity of certain amendments to the Highway Act, which had originally been enacted in 1917 before the amendments at issue.

In its original form, the Highway Act contained numerous sections, most of which could have been adopted by a simple majority vote. A few of the Act's sections, however, implicated a section of the Delaware Constitution concerning the issuance of debt and the incurrence of debt by the State. Therefore, those sections could only be adopted by a three-quarters vote of the General Assembly. They in fact received that vote.

Nonetheless, the court went on to examine the interplay of the different vote requirements in determining whether the 1939 amendments it was addressing—which were to sections of the Highway Act that did not implicate the three-quarters vote provision—were invalid because unrelated portions of the existing Highway Act were subject to the three-quarters vote provision. Put another way, the plaintiff argued that the fact that the original Highway Act was subject to a three-quarters vote meant that any future amendment to that Act also required a three-quarters vote.

In rejecting this contention, the Superior Court stated:

When the original Act was passed in 1917, it would have required but a majority vote in each House, had the Bill contained nothing of a nature which by the Constitution required a greater vote. In other words, the vote of three-fourths of the members of each House of Assembly which the original Highway Act required and received, was because such original Act provided for the creation of a debt against the State, and this provision, by the Constitution, required a three-fourths vote of each House.

*If, upon the original passage of the Highway Act in 1917, the statute had not received the three-fourths vote of each House, only that portion of the Act would have been invalid which required a three-fourths vote, and did not in fact receive it, and that portion of the statute would have been valid which required but a majority vote. It is a well settled principle of statutory construction that where a statute contains two matters of severable nature, and one matter contravenes the Constitution and the other does not, then only that part will be held void which is violative of the Constitution, and the other part will be valid.* Of course, where a stipulated subject matter, such as the creation of a debt against the State, requires a vote of three-fourths of all the members elected to each House of Assembly, we agree that such subject matter may not be afterwards enlarged by amendment by means of a lesser vote. Where, however, a statute consists of severable parts, and a portion would not have required for its original enactment more than a majority vote, we see no reason why this part of the Statute may not be amended by that same vote which would have been sufficient for its original enactment, had it been in fact severed from

17. 10 A.2d 515.

the part requiring a greater vote. Both reason and authority sustain this view.[18]

The plaintiffs attempt to cabin the reasoning of *Emerson* to the legislative context, in which they assert that unique public policy reasons justify a more flexible approach. Unlike contracts, plaintiffs say, statutes do not turn on promises and interdependent rights, or the intentions of the contracting parties. Moreover, statutes are the product of co-equal branches of government and courts are thus naturally reluctant to declare them invalid. The plaintiffs argue that these prudential considerations do not apply in the context of contractual interpretation.

■ I find this argument unconvincing. As is often true in contracts, statutes frequently involve interdependent provisions that require the government to do certain things and its citizens others. The interpretation of statutes, like that of contracts, involves a text-based search for the intent of the drafters, in which evidence extrinsic to that text can rarely be consulted. Perhaps most important, I see little logic as a matter of social utility in applying rules of interpretation to private economic activity that are less practical and efficient than are applied to statutory acts regulating the conduct of citizens, often at pain of penal punishment. The approach that this State has historically taken to the regulation of economic activity by entities rests on flexibility and efficiency, not unjustified rigidity. This policy choice is reflected in decisions addressing analogous questions in the corporation law context.[19]

18. 10 A.2d at 521. Other states have taken a similarly practical approach. For example, in *State v. Kirby*, 34 S.D. 281, 148 N.W. 533 (1914), a defendant challenged his conviction for hunting without a license on the grounds that the bill that enacted that offense had contained an appropriation requiring a two-thirds vote and that no such vote was obtained. Assuming that this fact was true, the South Dakota Supreme Court rejected this defense stating that "even if the appropriation features [of the bill] were invalid, that would not affect the remainder of the act." *Id.* at 535.

19. *Tri–Star*, 634 A.2d 319 exemplifies this practical approach to dealing with problems like this in the entity context. In that case, the plaintiffs challenged the validity of a certificate amendment, Article VI, that had been approved along with a business combination by a single vote. The plaintiffs argued, and the trial court held on a motion to dismiss, that Article VI was potentially invalid because it exculpated directors in a manner not permitted by 8 *Del. C.* § 102(b)(7). *Siegman v. Tri–Star Pictures, Inc.*, Del.Ch., C.A. No. 9477, 1989 WL 48746, at *7–*8, Jacobs, V.C. (May 5, 1989 rev. May 30, 1989). The certificate amendments, including Article VI, "were to be an integral part of the Combination presented to shareholders for their approval." *Id.* at *2.

Thereafter, the company consummated a merger with a third-party that resulted in the elimination of Article VI from the surviving corporation's certificate. As a result, the Court of Chancery held in an oral opinion that the plaintiffs' challenge to Article VI had been mooted by its elimination in the later merger.

The Delaware Supreme Court affirmed this ruling on appeal, and rejected the idea that Article VI's inclusion in a single ballot proposal with the combination "poisoned the entire voting process and thus[ ] work[ed] to invalidate the Combination ..." *Tri–Star*, 634 A.2d at 334. Because the stockholders had been told that all the certificate amendments (including Article VI) and the combination would be approved in one vote, the Court held that there was no "support in law or reason" for plaintiffs' claims that the alleged invalidity of the certificate amendment "has any relevance to the validity of the Combination." *Id.* at 335. In so ruling, the Court appeared to adopt the defendants' contention that "the failure of one provision has no effect on other matters voted on because the remedy for an invalid charter provision is refusal to enforce it, not setting aside the whole charter, much less the Combination." *Id.* at 334.

This court adopted a similarly practical approach in *Supermex Trading Company, Ltd. v. Strategic Solutions Group, Inc.*, Del.Ch., C.A. No. 16183, 1998 WL 229530, mem. op.,

As a prudential matter, therefore, I do not find plaintiffs' argument appealing. Nor am I persuaded by the plaintiffs' attempt to argue that the Severability Clauses in the Original Agreement and the Proposed Agreement can be given no weight in determining the intent of the public unitholders. The plaintiffs' argument is subtle and has a certain facial logic. As to the Severability Clause in the Original Agreement, the plaintiffs simply say that that provision obviously cannot have any bearing on whether the public unitholders intended the portions of the Amendment to be severable. As to the Severability Clause in the Proposed Agreement set forth in the Amendment, the plaintiffs argue that because the Amendment did not pass by a unanimous vote none of the provisions of the Amendment became effective, including the Severability Clause. As a result, the Severability Clauses should have no bearing on the court's determination of the unitholders' intent.

This reasoning loses any appeal when a simple analogy to the legislative context is examined. In considering a post-enactment challenge to provisions of a bill that has been codified, the court will naturally give weight to whether the bill contained a severability provision. Such a provision answers the question of whether the legislature intended the entire bill to be invalidated if one of the provisions was flawed. If the legislation's severability clause would itself be accorded no respect unless the bill was otherwise flawlessly adopted, much of the clause's utility would be lost. For obvious reasons, the law has not taken the plaintiffs' approach in the legislative context.

■ It is equally difficult to understand what useful purpose is served by ignoring a severability provision contained in a proposed limited partnership agreement amendment in similar circumstances. When such a provision has been approved in an amendment with the assent of a majority of the public unitholders, the provision would seem to be reliable evidence of the unitholders' beliefs about whether an invalid component of the amendment would thereby invalidate the remaining components.[20]

Therefore, I give great weight to the Severability Clause in the Amendment. That provision expresses the public unitholders' view that an invalid provision like the proposed change to § 15.1(b) would not result in the invalidation of the entire Amendment. It would be disrespectful of that intent and impractical to not give effect to that provision in the circumstances presented in this case.

After all, the plaintiffs have been unable to articulate a reasoned basis to believe that the exclusion of the proposed change to § 15.1(b) from the amendment would have led the public unitholders to vote against, rather than in favor, of the Amendment. The proposed change to § 15.1(b) was wholly immaterial to the

Lamb, V.C. (May 1, 1998). In that case, the plaintiff challenged certain bylaw amendments that were rescinded in response to the lawsuit. The court therefore found "it unnecessary and inappropriate to comment further on their adoption, and [would] not enter any order with respect to those bylaws other than to note that they have been rescinded and to dismiss the claims with respect to them as moot for that reason." *Id.* at 23.

20. *See Orenstein v. Kahn,* Del.Supr., 119 A. 444, 445 (1922) (in deciding whether a contract is severable, "the essential question is to ascertain the intention of the parties"); 15 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 45:6 (4th ed. 2000) ("The parties' intent to enter into a divisible contract may be expressed in the contract directly, through a so-called 'severability clause' . . . .").

vote on the Amendment and cannot logically have influenced the outcome.[21]

The best the plaintiffs can come up with is to argue that because the proposed § 15.1(b) was contained within a fully restated Proposed Agreement, the vitiation of the proposed § 15.1(b) leaves the Restated Proposed Agreement without a § 15.1(b) at all. Because § 15.1(b) is interrelated to other sections of the Restated Agreement—which by its own literal terms completely supersedes the Original Agreement—striking it is said to leave the Restated Agreement with an untenable void.

■ Again, this argument has some formalistic, but no practical, appeal. By leaving § 15.1(b) as it was in the Original Agreement, the General Partner implemented the remedy set forth in § 17.3 of the Original Agreement itself for situations like this and thus fully cured any harm caused by the failure to secure a unanimous vote for the proposed change to § 15.1(b).[22] This cure was also in keeping with the Severability Clause in the Proposed Agreement and the obvious intent of the provision of § 17.01, of the Proposed Agreement giving the General Partner the ability to make technical amendments.

The plaintiffs' answer to these contractual provisions that reflect the unitholders' desire for practical solutions to drafting problems is to argue that the vote on the Proposed Agreement left Holdings in a void where formalism must triumph over logic. They argue that if the Proposed Agreement was validly adopted, notwithstanding the inclusion of the proposed change to § 15.1(b), the effect of that adoption was to eliminate the remedy contained in § 17.3 of the Original Agreement, which would have left § 15.1(b) as it was. That result obtains because the supersession clause of the Proposed Agreement supposedly prevents recourse to § 15.1(b) of the Original Agreement.

If, on the other hand, the General Partner used § 17.01 of the Restated Agreement to amend the Proposed Agreement to restore the original § 15.1(b) of the Original Agreement after the change to § 15.1(b) as set forth in the Proposed Agreement went into effect, that change is said to be beyond the General Partner's power. Because the change would increase the vote requirement from a majority to a unanimous vote, it would impair majoritarian rights. As such, the amendment cannot be accomplished by the General Partner acting alone. That is, because the change would theoretically change a vote requirement that was never validly enacted and thereby injure wholly theoretical rights, the change exceeds the General Partner's authority under § 17.01 of the Restated Agreement.

■ In rejecting these arguments, I am guided by what I understand to be my duty, which is to give effect to the parties' intentions as expressed in the relevant contractual instruments.[23] These instru-

---

21. *Cf.* 82 C.J.S. *Statutes* § 39(b) (2000) (footnote omitted) ("Where an act is of much broader application than acts which are completely within the class for which a larger vote is required, the failure of the act to pass by the extraordinary majority does not defeat its validity entirely, but only so far as it comes within the terms of the provision, unless this section is so important a part of the act that without it the act would not have been passed.").

22. In so ruling, I embrace the defendants' reading of § 17.3 and reject the plaintiffs' reading, both of which are articulated at pages 18–20 *supra.*

23. *Continental Insurance Co., v. Rutledge & Co., Inc.*, Del.Ch., 750 A.2d 1219, 1228 (2000) (" '[I]t is the policy of [the Delaware Revised Uniform Limited Partnership Act] to give maximum effect to the principle of freedom of contract and to the enforceability of partner-

ments clearly eschew the "trap door" approach to the contract amendment process so avidly embraced by the plaintiffs. The inordinate weight the plaintiffs give to the supercession clause of the Proposed Agreement is not only impractical, it is at odds with the specific provisions of the instruments bearing more directly on the question. Taken together, the (i) more limited and specific contractual remedy set forth in § 17.3 for situations where an amendment does not receive the required number of votes, (ii) the Severability Clauses, and (iii) the power given to the General Partner under § 17.01 to amend the partnership agreement to fix errors of this sort, unequivocally demonstrate the unitholders' rejection of plaintiffs' construction. These provisions operate to protect the legitimate interests of the unitholders while permitting the efficient procession of the entity in circumstances where a hyper-technical approach could produce results absurdly disproportionate to the defect in issue. They do so by allowing the General Partner to do as it did here—address the harm threatened by a defective amendment by ensuring that the amendment (per § 17.3 itself and/or the power granted the General Partner by § 17.01) never takes effect in the first place. These safeguards allow the otherwise untainted portions of amendments to the partnership agreement to go into effect, while preserving the preexisting rights of the unitholders under provisions that did not receive valid approval.

By contrast, the plaintiffs' attempt to use the proposed change to § 15.1(b) as a basis to invalidate the entire Restated Agreement is contrary to the clear intention of the relevant instruments governing Holdings, and would result in an inequitable and impractical result. Therefore, I grant the defendants' motion to dismiss

Count I of the Amended Complaint as moot.

Quite obviously, this dismissal does not impair the right of the plaintiffs to seek appropriate fees and expenses in connection with the General Partner's decision to leave § 15.1(b) as it was in the Original Agreement. That decision appears to have resulted from this litigation.

B. *What Is The Role For Principles Of Fiduciary Duty To Govern The General Partner's Obligations Regarding The Reorganization?*

The Amended Complaint alleges that the General Partner's decision to recommend the Reorganization was made in breach of its fiduciary duties of loyalty and care. The Reorganization is said to have been motivated solely to advantage Equitable as the majority unitholder and corporate parent of the General Partner, without conferring any benefit on Holdings' public unitholders. Even worse, the Reorganization is asserted to have left the Holdings' public unitholders worse off because of certain changes made in the Holdings and Capital partnership agreements.

The defendants move to dismiss this fiduciary duty claim on the grounds that the Original Agreement of Holdings set forth specific criteria—most notably, Majority Outside Approval—that had to be satisfied to accomplish transactions like the Reorganization. These criteria, defendants argue, displace the default fiduciary duties that otherwise would be owed by the General Partner in connection with such transactions. As a result, the defendants assert that the issue of liability in this case turns solely on whether the General Partner fulfilled the contractual criteria necessary to consummate the Reorganization.

ship agreements.' ") (*quoting* 6 *Del. C.* § 17–1101(c)).

Section 17–1101(d) of the Delaware Revised Limited Partnership Act permits the expansion or restriction of fiduciary duties in a limited partnership agreement.[24] The defendants argue that § 6.13 operates to restrict the application of default principles of fiduciary duty because it sets forth a specific contractual procedure for the accomplishment of an asset transfer to an entity affiliated with the General Partner. That procedure requires Majority Outside Approval, a procedural protection that in the corporate context would be an optional and not mandatory approach. As a result of the fact that the Original Agreement itself sets forth a procedural protection for the public unitholders, the defendants argue that the protection also acts as a safe harbor from liability for the General Partner for any breach of fiduciary duty.

The plaintiffs, of course, vigorously dispute this argument, and point to the absence of any language in § 6.13 that expressly restricts the operation of default fiduciary duties. Likewise, the plaintiffs contend that this is not a situation where a contractual right granted to the general partner (*e.g.*, the right to compete against the limited partnership) would be vitiated if certain concepts of fiduciary responsibility were applied (*e.g.*, concepts comparable to the corporate opportunity doctrine).[25] As such, they contend that the default fiduciary duties of care and loyalty have full application here.

The arguments presented again place this court in the position of making a less-than-scientific judgment about the interplay between the contractual and fiduciary duties of general partners of limited partnerships. Determinations of whether the provisions of a limited partnership agreement are inconsistent with the application of default fiduciary duties are necessarily imprecise and often require close judgment calls. While demanding that the parties to a limited partnership agreement make their intentions to displace fiduciary duties "plain," [26] the cases have erred on the side of flexibility regarding the type of evidence sufficient to support a judicial finding that such an intention existed. Resisting the temptation to resolve hairsplitting questions by reference to maxims of interpretation, our courts have thus far adhered as a general matter to a close examination of whether the application of default fiduciary duties can be reconciled with the practical and efficient operation of the terms of the limited partnership agreement. Where such a reconciliation is possible, the court will apply default fiduciary duties in the absence of clear contractual language disclaiming their applicability. But where the use of default fiduciary duties would intrude upon the contractual rights or expectations of the general partner or be insensible in view of the contractual mechanisms governing the transaction under consideration, the court will eschew fiduciary concepts and focus on a purely contractual analysis of the dispute.[27] Put

---

**24.** *6 Del. C.* § 17–1101(d).

**25.** For a well-reasoned decision holding that the corporate opportunity doctrine could not be applied against a general partner that had the contractual right to compete, *see Kahn v. Icahn*, Del.Ch., C.A. No. 15916, 1998 WL 832629, mem. op., Chandler, C. (Nov. 12, 1998).

**26.** *Sonet v. Timber Co., L.P.*, Del.Ch., 722 A.2d 319, 322 (1998).

**27.** *See, e.g., In re Marriott Hotel Properties II Limited Partnership Unitholders Litig.*, Del. Ch., C.A. No. 14961, 1996 WL 342040, mem. op. at 15, Allen, C. (June 12, 1996) & *In re Marriott Hotel Properties II Limited Partnership Unitholders Litig.*, Del.Ch., C.A. No. 14961, 1997 WL 589028, mem. op. at 10–12, Lamb, V.C. (Sept. 17, 1997) (contractual discretion of general partner to deny admission to prospective limited partners was inconsistent with the imposition of so-called *Revlon*

somewhat differently, the irreconcilability of fiduciary duty principles with the operation of the partnership agreement can itself be evidence of the clear intention of the parties to preempt fiduciary principles.

■ In this case, I conclude that the partnership agreement and fiduciary duties intersect at a precise and legally relevant point, reducing the question of whether the partnership agreement and fiduciary duties have been breached largely to a single inquiry in the first instance. Under corporation law principles, a transaction between a controlling stockholder and the corporation can be ratified by an informed, uncoerced majority vote of the minority stockholders.[28] In the case of such ratification, the transaction is protected by the business judgment rule.[29] Thus, the ratification vote obviates any generalized fairness inquiry.

There is no reasoned basis to give less weight to a unitholder vote in the limited partnership context than is given to a stockholder vote in the corporate context.

When unitholders have the contractual opportunity to protect themselves against an unfair vote simply by voting no, it would be paternalistic and inefficient for courts to exercise a supervening judgment to protect the unitholders from their own erroneous investment decision.[30] It is at best highly doubtful the court is in a better position than unitholders to determine the economic utility of transactions put to them; moreover, it seems a misallocation of judicial resources to have courts reassess the fairness of transactions that minority unitholders could have blocked themselves.

■ Under the Original Agreement, the Reorganization had to be accomplished by Majority Outside Approval. If such Approval was procured on the basis of adequate, non-coercive disclosures, the Approval would be sufficient to satisfy the Original Agreement. Likewise, the Approval would suffice to invoke the business judgment rule under default principles of fiduciary duty.

duties); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, Del.Ch., C.A. No. 15754, 2000 WL 1476663, mem. op. at 26–28, Strine, V.C. (Sept. 27, 2000) (following same approach); *In re Cencom Cable Income Partners, L.P. Litig.*, Del.Ch., C.A. No. 14634, 1997 WL 666970, mem. op. at 9–13, Steele, V.C. (Oct. 15, 1997) (when partnership agreement set forth specific procedures governing how the price would be set in any sale of assets to an affiliate of the general partner, compliance with those procedures was sufficient and the general partner was not required to market the assets to third parties or to engage in arm's length-bargaining).

28. For relatively recent discussions of the effect of shareholder ratification, see the decisions of this court in *In re General Motors Class H Shareholders Litig.*, Del.Ch., 734 A.2d 611 (1999); *Solomon v. Armstrong*, Del.Ch., 747 A.2d 1098 (1999), *aff'd*, Del.Supr., 746 A.2d 277 (2000). A specialized rule applies in the case of a squeeze-out merger proposed by a controlling stockholder, *see Kahn v. Lynch Communication Systems, Inc.*, Del.Supr., 638

A.2d 1110 (1994). The Reorganization at issue in this case is not comparable to such a transaction; moreover, it would seem unwise to expand this doctrinal anomaly into the limited partnership setting.

29. There are narrow and largely moribund exceptions under which a properly ratified transaction is theoretically still subject to challenge. One such exception is if the transaction ratified by informed, uncoerced independent stockholders is nonetheless found by a judge to constitute waste. *See Harbor Finance Partners v. Huizenga*, Del.Ch., 751 A.2d 879, 895–902 (1999) (discussing the lack of justification for the waste exception to ratification effect). Here, there is an obviously rational business purpose to the Reorganization and the amended complaint does not attempt to allege waste.

30. *Sonet*, 722 A.2d at 326 (1998) (where unitholders could veto a transaction proposed by the general partner, "their remedy is the ballot box, not the courthouse").

Given these considerations, the important role that default concepts of fiduciary duty play in this case must initially focus on whether the general partner disclosed all material facts necessary for the public unitholders to make an informed vote on the Reorganization. To the extent that the General Partner satisfied its disclosure obligations, that showing suffices to insulate it from contractual or fiduciary liability. But if the General Partner did not provide the unitholders with the information necessary to make an informed judgment, the Reorganization would not have been validly approved and a remedy would likely be required. Whether there would be more than one rationale for this conclusion is an interesting question of more academic, than practical, importance at this stage.[31] As such, it can be left to another day,[32] so that the crucial questions on which the rest of this motion hinge can be answered.[33]

### C. Does The Amended Complaint State A Claim That The Disclosures Were Materially Misleading Or Incomplete?[34]

■ The defendants concede that the General Partner had a duty to disclose fully and fairly all material facts within its control that were relevant to the public

---

31. One could conceive of the General Partner's failure to disclose all material facts as a violation of the partnership agreement's implied covenant of good faith and fair dealing, which operates a necessary complement to the requirement for Majority Outside Approval. One can also simply find that the partnership agreement recognized that the General Partner would bear default fiduciary obligations of disclosure in connection with any vote of unitholders, the violation of which could result in the invalidation of the transaction tainted by the misdisclosure.

Similarly, if the vote were tainted by misdisclosure, the defendants could attempt to show that the Reorganization could not be practically rescinded and was otherwise entirely fair. As a result, it would argue that its only contractual and/or fiduciary breaches were in the disclosure area and that the remedy should be nominal damages only.

32. "Sufficient unto the day is the evil thereof." *Matthew* 6:34.

33. This case thus presents a subtle variation on the issue confronted by Chancellor Chandler in the *Sonet* case. In that case, the partnership agreement subjected some unilateral decisions of the general partner to a "fair and reasonable" standard that was found by the Chancellor to be a contractual acceptance of default loyalty and care obligations. *Sonet*, 722 A.2d at 324 & n.12. The transaction at issue, however, was a merger that could be recommended by the general partner in "its own discretion" (*i.e.*, without consideration of limited partners' interests), but which was subject to the approval of two-thirds of the unitholders. *Id.* at 325. Therefore, the Chancellor found that the general partner had no generalized fiduciary duty of fairness in connection with the merger, but had to comply with its fiduciary duty of disclosure so that the vote would be an informed one. *Id.* at 327.

By contrast, in this case the Original Agreement does not say that the General Partner can propose the Reorganization in its sole discretion, nor does it subject that decision to some other standard, such as good faith. Arguably, it therefore leaves default concepts of fiduciary duty in place. That is of no moment, however, when one considers the fact that compliance with the duty of disclosure and the Majority Outside Approval requirement work in tandem to extinguish any fiduciary duty claim. In reality, therefore, the Original Agreement creates a safe harbor, that if effectively utilized, is outcome determinative. In the event that the safe harbor does not apply, the defendants would face liability under both contractual and fiduciary theories.

34. The defendants argue that the plaintiffs' disclosure claims are barred by laches. Because the Proxy was available for six weeks before the vote on the Reorganization and the plaintiffs did not file their first complaint until a week after the vote, the General Partner was never given an opportunity to correct any problems with the Proxy before the vote. Given the public policy favoring the prompt resolution of disclosure claims so that the

unitholders' decision whether to approve the Proposed Agreement and the Reorganization.[35] "A fact is material if (i) 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to vote'; (ii) 'would have assumed actual significance in the deliberations of the reasonable [investor]'; or (iii) would have 'significantly altered the 'total mix' of information made available.' "[36] The General Partner may have also breached its duty of fair disclosure if it made partial disclosures which, even if literally true, created a materially misleading impression of relevant factual circumstances bearing on the fairness of the transaction subject to the vote.[37]

1. *Does The Complaint State A Claim That The General Partner Did Not Fairly Disclose The Material Facts Regarding The Guaranteed Fee?*

As discussed earlier, the plaintiffs allege that the defendants misleadingly portrayed the value of the Guaranteed Fee in order to convince the public unitholders that they had something to gain from the Reorganization when that was in fact not the case. In support of that allegation, the plaintiffs note that the Proxy portrayed the Guaranteed Fee in a manner that could be read as indicating that the public unitholders were being afforded the opportunity to share in the benefits of $38 million in annual incremental benefit for the next five years. Indeed, the public unitholders were told that the Guaranteed Fee had a monetary value to them of twenty-seven cents to sixty-four cents per unit.

A fair disclosure, plaintiffs say, should have disclosed at least the following additional information: (i) the fact that the fees Holdings had received for the previous five years had equalled or exceeded $38 million each year; (ii) the fact that Holdings' internal business plan projected that the fees for the following five years would

---

preferred remedy of supplemental disclosure can be awarded, defendants argue that it was unreasonable for the plaintiffs to file so late.

I decline the defendants' request that I adjudicate this defense on a dismissal motion. Granting the request would involve the articulation of a novel doctrine of disclosure law and the defendants' papers do not provide sufficient case law support for that evolution in the law. While it is obviously preferable that disclosure claims be litigated in advance of the relevant decision to be made by unitholders, that preference does not necessarily translate into the conclusion that a challenge brought within two months after disclosure but after the vote is necessarily barred by laches. In view of the voluminous disclosures made in connection with the Reorganization vote and the intricacy of some of the disclosure issues presented, I cannot conclude at this stage that the plaintiffs' delay was unreasonable.

In this regard, I note that the plaintiffs did seek relief before the consummation of the Reorganization. The plaintiffs' agreement to allow the Reorganization to close and the leisurely pace at which they have pressed this litigation to date obviously render rescission of the Reorganization impractical and inequitable. The plaintiffs' failure to proceed more promptly is also a proper factor in considering the other relief that they might receive, as my analysis of the merits of plaintiffs' claims acknowledges. Nonetheless, the plaintiffs' delay is not so obviously prejudicial as to bar them the right to seek any relief at all in connection with the Reorganization. Therefore, I deny the defendants' motion to dismiss on this basis.

35. *Sonet v. Plum Creek Timber Co., L.P.*, Del. Ch., C.A. No. 16931, 1999 WL 160174, mem. op. at 18, Jacobs, V.C. (Mar. 18, 1999) ("*Sonet II*") (applying this standard in the limited partnership context); *see also Stroud v. Grace*, Del.Supr., 606 A.2d 75, 85 (1992) (stating this general principle in corporate case).

36. *Sonet II*, mem. op. at 19 (*quoting Arnold v. Society for Savings Bancorp.*, Del.Supr., 650 A.2d 1270, 1276 (1994)).

37. *Sonet II*, mem. op. at 19.

exceed $38 million annually; and (iii) the fact that Equitable had never threatened to terminate the contract by which the fees were generated and was unlikely to do so. Had these additional factors been disclosed, plaintiffs contend that the overall mix of information would have changed in a material way. This additional information would have demonstrated that the Guaranteed Fee was little more than a modestly beneficial insurance policy against a highly improbable eventuality, and was not worth anywhere near what Goldman Sachs's analysis suggested it was.

The defendants retort by pointing out that the Proxy did disclose that Holdings had received $39 million in 1998—the year preceding the vote—for the same services covered by the Guaranteed Fee. Therefore, they argue that the public unitholders had no reason to infer that the Guaranteed Fee was likely to result in $38 million in additional revenues to Holdings, rather than simply act to lock-in that existing revenue stream. Furthermore, the defendants note that the complaint is imprecise and that the plaintiffs fail to allege that the past and projected fees were only for services covered by the Guaranteed Fee. Therefore, the defendants note that the plaintiffs seek disclosure of information that itself would have been misleading. In a similar vein, the defendants contend that Holdings' projections of future fees was unreliable, soft information that the General Partner had no duty to disclose. Finally, the defendants argue that the General Partner had no obligation to disclose that there was no risk of termination of the fee-generating relationship with Equitable. If no material risk existed, defendants say, what was there to disclose?

In evaluating this issue, it is critical to bear in mind the procedural context in which it is presented. At this stage, I must draw all reasonable inferences from the complaint in the manner most favorable to the plaintiffs. Applying this standard faithfully leads me to deny this aspect of the defendants' motion to dismiss.

The Guaranteed Fee (and the Termination Fee) were of more than minor importance to the vote on the Reorganization. While the Reorganization can be seen as a harmless transaction that produced benefits for Equitable at no cost to the public unitholders, the Proxy did not pitch the transaction in that manner. Instead, the Proxy informed the public unitholders that Goldman Sachs believed they would be better off after the Reorganization than they were before it, to the tune of twenty-seven cents to sixty-four cents a unit.[38]

The sole bases for this conclusion were the Guaranteed Fee and the Termination Fee. In assessing this purported value, the information that the plaintiffs contend was omitted could, in my estimation, have been material. As written, the Proxy gives little context to put the Guaranteed Fee in perspective. If it is true that the Guaranteed Fee was little more than a cosmetic guarantee of a highly reliable revenue stream, the Proxy could well be seen as materially misleading.

While it is true that the Proxy disclosed that Holdings had received $39 million in comparable fees in 1998, that disclosure was not repeated in the section of the Proxy describing Goldman Sachs' opinion about the incremental value the Guaranteed Fee delivered to the public unitholders. Without more information, it is also

---

**38.** This is, I emphasize, a pleading stage analysis. The Proxy indicates that sixty-four cents a unit is equal to approximately one-third of one year's distribution per unit to unitholders. Proxy at 11. Because the parties did not focus on this point, I will not, although it suggests that the plaintiffs' claim is vulnerable to later challenge on a fuller record.

**502**

impossible to infer that knowledge of one year's fees is sufficient to fairly place the Guaranteed Fee in an appropriate context. If based on a reliable foundation, disclosure of the following information would have been helpful: (i) the fact that the Guaranteed Fee locked in revenues at a level less than such revenues for the preceding five years; and (ii) the revenues Holdings had projected (before the Guaranteed Fee Agreement) from those fees for the succeeding five years for the succeeding five years. At this stage, I feel constrained to give the plaintiffs the benefit of a pleading doubt that the omitted information was in fact of sufficient reliability and comparability to fairly bear on the question.[39] Likewise, the issue of whether the current fee stream was at risk without the Guaranteed Fee is an important one.

The plaintiffs allege that Goldman Sachs was unable to opine that the Reorganization would benefit the public unitholders without something more than a 1:1 exchange ratio, and that the Guaranteed Fee was window-dressing to get Goldman Sachs to issue a different opinion. If it is the case that the Guaranteed Fee was in essence an unnecessary insurance policy—and there are pled facts that support this inference—disclosure regarding the risk that the Guaranteed Fee was designed to address could have materially altered the mix of information.

In sum, while the plaintiffs have not suggested that any information in the Proxy about the Guaranteed Fee was literally false, they have pled facts that support the inference that other information had to be disclosed in order to ensure that a materially misleading impression was not created about the value of that Fee.

2. *Did The Proxy Omit Material Facts Regarding The Benefit Of The Reorganization To Equitable?*

■ The plaintiffs contend that the Proxy should have disclosed that Equitable would receive a regulatory benefit of $277 to $298 million from the Reorganization, because the decreased tax on its holdings would increase its market capitalization. This estimate is alleged to have been made by Goldman Sachs.

The defendants' response to this allegation is straightforward and convincing. They note that the Proxy clearly estimated that Equitable would receive increased revenues of approximately $17 million annually, because of its avoidance of the 3.5% tax. Given that Equitable is a publicly-traded corporation, any public unitholder could calculate the favorable effect that the increased cash stream might have on Equitable's stock price, using publicly available price to earnings ratios.

■ I agree with the defendants that the information the plaintiffs contend should have been disclosed would not have materially changed the total mix. The

**39.** The defendants' assertion that internal projections of company revenues are not material simply because they are projections of future events is erroneous. Certainly, courts are more reluctant to require disclosure of such "soft information," but that does not mean that such information cannot be material. Indeed, it would be impossible for there to be meaningful disclosure about many transactions if that was the case, because determining the advisability of a transaction often requires a comparison of the transactional value to be received to the value that would likely be received in the event that the transaction was not effected. The defendants' disclosure of the Goldman Sachs' valuation of the revenues projected from the Guaranteed Fees is an example of disclosure that incorporates reasoned assumptions in order to present stockholders with materially important information. Therefore, I cannot rule out the possibility that Holdings' internal projections were sufficiently reliable to warrant disclosure.

Proxy clearly stated that Equitable wanted to exchange as many of units as it could in order to avoid the 3.5% tax. The Proxy stated the number of units that Equitable held and the annual benefit the tax avoidance would produce. Any reasonable investor would have understood that Equitable stood to reap substantial financial benefits from the Reorganization. Goldman Sach's estimate of that value would have contributed little that could not already be gleaned from the Proxy. As such, this component of plaintiffs' disclosure claim is dismissed.[40]

3. *Does The Complaint State A Claim That The Proxy Falsely Represented That Public Unitholders Who Did Not Participate In The Exchange Would Not Have Their Existing Rights Or Benefits Adversely Affected?*

The Proxy states that the "reorganization will not adversely affect any existing rights or benefits or afford any new rights or benefits to unitholders who elect to continue to hold their ... Holding[s] units."[41] The plaintiffs argue that this statement was false in several respects.

In considering the particulars, the larger context must be kept in mind. The Reorganization was designed to split what was (and remains) in reality a single business into two separate structures, with different tax treatment. Therefore, the drafters of the Reorganization-inspired documents, principally the Proposed Agreement and the proposed limited partnership agreement for Capital, attempted to maintain the same rights and powers held by the General Partner, Equitable, and the public unitholders after the Reorganization as existed before the Reorganization. This attempt was obviously complicated by the fact that there would be two limited partnerships involved, and that the relevant rights and powers would therefore have to be implemented through the interaction of two separate limited partnership agreements. Many of the deficiencies cited by the Amended Complaint result from imperfections in that larger effort.

Another larger point is in order. While the Proxy did state that there would be no material adverse affect on the public unitholders' pre-existing rights, that statement is obviously one of opinion. The Proxy attached in their entireties the proposed limited partnership agreements for both Holdings and Capital, and made clear that the Proxy's textual comparison of the pre-existing agreements to the proposed agreements was not complete. Although the Proxy also indicated that the comparison summarized the material differences, it therefore also clearly signalled that an element of judgment was involved and gave the public unitholders the full text needed to make their own determination. It did not, however, give them a "redlined" version of the agreements that made identifying differences easier, as plaintiffs note.[42]

---

**40.** The amended complaint also suggests that the Proxy failed to disclose that Equitable would also benefit from the Guaranteed Fee equally with the public unitholders. This fact is obvious and easily discerned from the Proxy. As such, this allegation of the complaint fails to state a claim.

**41.** Proxy at 2.

**42.** The plaintiffs claim that the General Partner knew that the Proposed Agreement negatively affected the rights of the public unitholders and that is why the Amendment was subjected to Majority Outside Approval. This confessional evidence of knowing misdisclosure is unconvincing because the Majority Outside Approval that was sought involved the definition applicable to asset sales governed by § 6.13. *See* Proxy at 3 (using this definition); Original Agreement at A–6. The General Partner argues persuasively that it subjected the Amendment to that vote be-

### a. Did The Proxy Fail To Disclose A Material Change In The General Partner's Fiduciary Duties?

 The Proposed Agreement contained a new § 6.08(c), which was never discussed in the text of the Proxy and which stated as follows:

(c) To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the Partnership or to any Partner, any such Indemnified Person, including the General Partner, acting under this Agreement shall not be liable to the Partnership or to any Partner for its good faith reliance on the provisions of this Agreement. *The provisions of this Agreement, to the extent that they restrict the fiduciary duties and liabilities of an Indemnified Person otherwise existing in law or in equity, are agreed by the Partners to replace such other duties and liabilities of such Indemnified Person.*[43]

The plaintiffs argue that the insertion of this proposed section—in particular, its second sentence—was an attempt to "convert[ ] virtually every provision in the Partnership Agreement into a contractual provision displacing any default fiduciary duty."[44] As such, plaintiffs contend that it was a material, adverse change to the rights of the public unitholders.

The defendants have two responses. First, they note that the General Partner omitted the second sentence of proposed § 6.8(c) from the Restated Agreement and therefore that no harm was suffered by the public unitholders. Second, they contend that proposed § 6.8(c) is no more

than a redundant reiteration of 6 *Del. C.* § 17–1101(d), which has a meaning that is identical to the language of § 6.8(c).

I agree with the defendants' second argument. The first argument is really one in support of a mootness dismissal. The second argument goes to whether § 6.8(c) actually threatened a material change in the public unitholders' rights. A careful reading of the proposed section reveals it to be nothing more than an inartful rearticulation of § 17–1101(d), with the first sentence tracking § 1101(d)(1) and the second sentence tracking § 1101(d)(2). Nothing in proposed § 6.08(c) operates as the far-reaching elimination of fiduciary duties that plaintiffs contend; all it does is state the obvious: if the Proposed Agreement's provisions restrict fiduciary duties, that restriction is effective and binding. Therefore, I dismiss this aspect of plaintiffs' disclosure claim.

### b. Did The Proxy Fail To Disclose A Material Adverse Change In The Public Unitholders' Inspection Rights?

 The Proposed Agreement retained the existing provision of the Original Agreement governing the public unitholders' right to inspect books and records of Holdings. Therefore, the Proxy stated that the inspection rights of the public unitholders of Holdings would be the same after the Reorganization as before.[45]

The plaintiffs point out that this statement was literally true as a contractual matter, but not as a practical matter. Because Holdings would be a mere holding entity after the Reorganization, its unitholders would not have the same functional

cause the Amendment was necessary to the effectuation of the Reorganization. In sum, the inference the plaintiffs seek to draw is unreasonable and not supported by the pled facts.

43. Proposed Agreement § 6.08(c) (emphasis added).

44. Pls.' Br. at 54.

45. Proxy at 69.

inspection rights unless they were afforded the right to inspect Capital's books and records. That is, the Reorganization operated to deprive the Holdings unitholders of their then-existing ability to inspect the books and records of the operating company.

After the plaintiffs' original complaint was filed, the General Partner amended the inspection rights provision to make clear that the public unitholders of Holdings had the right to seek books and records from Capital. This cure repaired any inadvertent harm to the public unitholders' rights. Nonetheless, the plaintiffs still press this issue as a disclosure matter.

Without prejudicing the plaintiffs' right to claim appropriate recompense for the benefit produced by their surfacing of this issue in the complaint, I conclude that this issue cannot stand as a disclosure claim. The fact is that the Proxy accurately described the fact that the Proposed Agreement did not change the inspection rights of Holdings unitholders to *books and records from the partnership of which they were a unitholder*. To the extent that they did not participate in the Exchange, that partnership was Holdings itself, which the public unitholders were told would not be an operating company. The public unitholders were also given the Proposed Agreement and could read this for themselves.

As a literal matter, therefore, there was no diminution in the inspection rights of Holdings unitholders *qua* Holdings unitholders, and the practical diminution identified by the plaintiffs could have been discerned from the disclosure itself. Thus, all the plaintiffs can really assert is that the General Partner should have better grasped the practical import of the Reorganization for inspection rights and have

highlighted it better. Given that Holdings itself retained inspection rights in Capital and that its General Partner owes fiduciary duties to the public unitholders that demand it to exercise those rights in the interests of the public unitholders when necessary to protect Holdings, there is even less to plaintiffs' assertion.

This issue reduces in my view to a difference of opinion, which investors could resolve for themselves based on the facts that were disclosed. Therefore, I grant defendants' motion to dismiss this aspect of the disclosure claim, without prejudice to any application by the plaintiffs for fees and expenses incurred in producing the benefit achieved by the broadened inspection right contained in the Restated Agreement.

c. *Did The Proxy Fail To Disclose A Material Change In The Right Of The Holding Unitholders To Call A Meeting*

Under the Original Agreement, a meeting of unitholders could be called by 25% of the holders. Because the public unitholders held 58.7 million of Holdings' 171.1 total units, 42.77 million units, or about 72.8% of the public unitholders could call a meeting.

As the Proxy clearly identified, the Proposed Agreement changed the percentage of units necessary to call a meeting at Holdings to 50%.[46] Thus, the plaintiffs' sole quibble is that this reduction is at odds with the Proxy's statement that the Reorganization did not have a material adverse effect on the rights of the public unitholders. That is, even though the public unitholders were told about the change in both the text of the Proxy and in the Proposed Agreement, they were materially misled because the Proxy stated an opin-

---

**46.** Proxy at 65.

ion regarding the materiality of that change which the plaintiffs contest.

In defending this claim, the defendants note that the practical effect of the Reorganization is to make it easier—rather than more difficult—for the public unitholders to call a meeting of the Holdings unitholders. Because very few public unitholders participated in the Exchange, a smaller percentage of public unitholders (50%) could call a meeting than was needed before the Reorganization (72.8%). The plaintiffs say this practical point is irrelevant because the higher threshold could have had a negative effect on the public unitholders' rights if over 37.5% of the public unitholders had participated in the Exchange, or a more than four-fold increase in what actually occurred. I disagree.

 The plaintiffs have the burden to plead facts that, if true, support the inference that there was a material misstatement. Because the Proxy contained an accurate and clear depiction of the proposed change and because there was no materially likely prospect that the proposed change would in fact diminish, rather than increase, the ability of the public unitholders to call a meeting, the Proxy's statement that the Reorganization did not alter the public unitholders rights in a materially adverse way was not materially misleading on account of this issue. Therefore, I grant defendants' motion to dismiss this feature of plaintiffs' disclosure claim.[47]

### III. Conclusion

For the foregoing reasons, defendants' motion to dismiss Count I of the complaint (the "unanimous vote" claim) as moot is GRANTED; defendants' motion to dismiss Count II (the disclosure claim relating to the Guaranteed Fee) is DENIED; defendants' motion to dismiss Count III (breach of fiduciary duties other than disclosure) is DENIED; and defendants' motion to dismiss Counts IV and V (plaintiffs'

---

**47.** The plaintiffs made a similar claim about adjustments in a call option contained in the Original Agreement. Their original arguments were flawed by a misunderstanding of the text of those adjustments. As reduced to their current form, plaintiffs' argument is that the changes in the enhanced call option have the effect of enabling the General Partner to issue units of Capital to Equitable and its affiliates without restriction by NYSE Rules, which subject unit issuances above certain percentage thresholds to unitholder approval. The change is thus argued to result in a materially adverse change to the unitholders' rights.

I reject this argument for several reasons. Again, the argument rests not on the failure of the Proxy to disclose the specifics of the change, but on a contention that the change is at odds with the Proxy's statement of opinion about the effect of that change. Second, plaintiffs do not explain how the NYSE protection was of material utility to the public unitholders when Equitable itself held enough units to approve any issuance requiring unitholder approval. Finally, plaintiffs ignore the fact that the General Partner cannot issue new units of Capital unless it determines in good faith that the issuance is in the best interest of Capital. If the General Partner makes an arguably bad faith issuance in the future, that can be challenged as a breach of duty to Capital and its unitholders—including Holdings. For all these reasons, I conclude that there was no material misstatement or omission regarding the call option in the Proxy and that this aspect of plaintiffs' disclosure claim must be dismissed.

Likewise, I also reject plaintiffs' "death by a thousand cuts" argument. This argument is that the numerous small problems in the Proxy, when taken together, render the Proxy as a whole materially misleading. Although in some circumstances the cumulative effect of individual non-material problems may rise to the material level, the numerous issues raised by the plaintiffs here do not produce such an effect.

other disclosure claims) is GRANTED.[48]

---

48. Counts VI and VII restate in different words plaintiffs' disclosure claims. They stand as they relate to the Guaranteed Fee, but otherwise are dismissed as disclosure claims. If the plaintiffs' remaining disclosure claims succeeds or fails, this resolution will heavily influence the fate of any remaining fiduciary claims incorporated in Counts VI and VII.